# LESLIE S. HIGH v. SUPREME LODGE OF THE WORLD, LOYAL ORDER OF MOOSE.[1]

### June 20, 1941.

### No. 32,775.

See 206 Minn. 599, 289 N. W. 519; 207 Minn. 228, 290 N. W. 425.

*Albert H. Ladner, Jr., A. A. Toivonen, Walter F. Dacey,* and *William H. Gurnee,* for appellant.

*Courtney & Courtney,* for respondent.

HILTON, JUSTICE.

Respondent, an attorney, brought an action against the Supreme Lodge of the World, Loyal Order of Moose, to recover the reasonable value of professional services performed in connection with the financial rehabilitation of Duluth Lodge No. 505. The amenability of the Supreme Lodge to process through service upon the officer in charge of the Duluth Lodge has been decided. High v. Supreme Lodge, 206 Minn. 599, 289 N. W. 519. On trial to the court, favorable findings for $2,000 were returned for respondent. The Supreme Lodge appeals from the judgment.

[1]Reported in 298 N. W. 723.

The services here involved are alleged to have been performed between May 1, 1935, and April 1, 1938. During the first year of that period, respondent was Dictator of the Duluth Lodge and also acted for more than a year as chairman of the budget committee in working out a plan for liquidation of the "deplorable financial distress" which threatened the existence of the Duluth chapter.

The financial difficulty arose chiefly from three sources. First, commencing about October 1, 1926, the Duluth Lodge, with the approval and consent of appellant, issued certificates of indebtedness to members in connection with the "purchase, equipment, establishment, and maintenance" of a building intended for use as the "Lodge home." However, it became necessary to surrender the contract for purchase because "the operation of said building and the attempted purchase of said premises had been so mismanaged." With the knowledge of appellant and notwithstanding insolvency, more certificates were issued. In addition to unpaid mortgage interest, delinquent taxes, and obligations owing to banks and others, the financial loss involved in this project had on February 9, 1932, resulted in an "indebtedness still outstanding against said Lodge in excess of * * * $30,000." Second, the delinquencies of the Duluth Lodge in returning that portion of the membership dues belonging to the national organization had on April 30, 1933, amounted to $12,768. The third phase of the financial fiasco arose from the "illegal and improper" handling of the beneficiary fund which had been irrevocably set apart for needy members. On April 30, 1933, "there was an overdraft of such beneficiary fund used for improper purposes in the sum of $12,-495.10." To the great detriment of the recipients and in violation of specific rule, an auditor, representing the Supreme Lodge, authorized the transfer of this overdraft to the general revenue fund. Through the medium of periodic audits and regular reports, appellant was apprised of the financial condition of the local Lodge. The trial judge has thus summarized the situation:

"At all times herein mentioned defendant knew the financial situation of said Lodge and that funds specifically due to the defendant herein were not being properly paid and that payment of interest was being made in an unauthorized and illegal manner upon said certificates of indebtedness issued by said [Duluth] Lodge, and that said Lodge was improperly continuing to sell said Certificates, and that nothing was done by or on behalf of the defendant effectively to improve, regulate, or adjust such financial condition of said Lodge."

This was the backlog of financial mismanagement with which respondent, as local Dictator, was confronted. Applying himself with diligence and perseverance, although not always with tact, during the time he was in office and afterward as attorney, respondent accomplished such results that "all of the obligations of Duluth Lodge * * * have been compromised, adjusted, and settled, through the payment of approximately the sum of $13,000, its morale has been sustained, and its membership substantially retained."

Respondent does not proceed upon an express contract. Rather, he asserts that legal services have been performed "under circumstances indicating that he expects to be paid therefor, and [appellant], knowing such circumstances, avails [itself] of the benefit of those services." Collins v. Lewis, 111 Conn. 299, 304, 149 A. 668, 670. What those circumstances are will be subsequently discussed.

Where an implied contract is relied upon as the basis for legal relief, that contract, if at all, must be deduced from the circumstances, relationship, and conduct of the parties. In such case, it is not expected that the elements of a contract will be as vividly portrayed by the evidence as where an express contract has been pleaded. However, reliance upon implied contract does not relieve plaintiff from his burden of establishing all essential contractual ingredients. For this type of case, we have said that plaintiff must prove "(1) that the services were rendered; (2) under cir-

474

cumstances from which a promise to pay for them should be im-plied; and (3) their value." Ertsgaard v. Bowen, 183 Minn. 339, 237 N. W. 1.

Though it is true that the sufficiency of the evidence to support the findings of fact may be challenged upon an appeal from a judgment, In re Estate of Fitzgerald, 205 Minn. 57, 285 N. W. 285; 1 Dunnell, Minn. Dig. (2 ed. & Supps.) § 388, this rule does not excuse the appealing party from compliance with Supreme Court Rule VIII(3)(d), 200 Minn. xxx, which requires specification of each finding of fact charged to be lacking in evidentiary support. Thus considered, we think the assignments of error competent only to raise one narrow issue: Does this record justify the trial judge's conclusion that the services performed by respondent were under circumstances from which a promise to pay for them could properly be implied?

At the outset, it should be clearly stated that the compensation which the lower court has allowed is only in payment of legal services. Respondent has not been compensated for any of the work which, as Dictator of the Duluth Lodge, he was expected to contribute to the welfare of the organization. Inherently, the successful liquidation of the financial instability of the local Lodge required legal services. As remarked by the trial judge: "Had a thoroughly competent business executive held the office of Dictator and had he managed the job as well as or better than [respondent] did, he would have had to hire a lawyer to advise him on the many legal questions that were involved, in order to have succeeded as well" as respondent. The most hasty perusal of the above outline of the Lodge's financial condition will convince anyone that the task of adjusting, repudiating, compromising, and settling the various creditors' claims against the Lodge was definitely legal in character.

There can be no doubt that the services performed by respondent were of vast benefit to both local and national organizations. But the simple fact of benefit without more does not impose con-

tractual liability. Services having gratuitous origins frequently are of great benefit to the recipients. However, we think that there is enough evidence in the record to sustain the view that the services were performed under circumstances from which a promise to pay their reasonable value may be implied.

Appellant was thoroughly familiar with the financial debacle facing respondent when he assumed office. Shortly thereafter, respondent began a series of conversations with officers representing the Supreme Lodge who expressed general approval with his plans and with the methods to be used in compromising the claims of the various creditors. More and more respondent began to realize that the job he was undertaking was not a local one. The Duluth Lodge, having obligations in the amounts heretofore set forth, had practically no unencumbered assets. By September, when he visited with the Dictator of the national organization at Duluth, respondent declared, "It isn't a job of the Lodge. * * * Anybody can see this is a job of the national organization." And again, "This isn't a Dictator's job. This is legal work." To this the Supreme Dictator replied, "There is no doubt about that." After expressing these views, respondent further remarked, "If the Supreme Lodge wants to take this thing over and let me out from the rest of this thing, they are as welcome as the flowers in May." Expressing an unwillingness to do this, the Supreme Dictator said: "Well, you seem to understand this situation. You have gone into it and have a grasp of it, and I don't see why you shouldn't keep on handling the matter until it is carried through." It was respondent's persistent view that he had made clear to the representatives of the parent organization that the job was national, that it was legal, and that he wanted to get rid of it. They, however, wanted him to keep it even after he had completed his term as Dictator, during which the bulk of the work was done. While upon the stand, respondent steadfastly maintained that, by virtue of the conversations and correspondence with many of the officers representing the national organization, he had been en-

476

gaged as counsel in handling the legal aspects of the liquidation project. We can well imagine that the task of dealing with upwards of 100 heterogeneous creditors, some of them represented by counsel, was not a pleasant one even to the most diligent lawyer. Certainly, it is clear that respondent felt that it was no part of his duty as Dictator. In view of the nature of the work, the extent of the benefit, and the solicitations from the national organization that respondent continue with the program even after his official capacity had ceased, we cannot say that the trial judge erred in concluding that a reasonable man in position of respondent properly could have believed that he was to be paid for his services. See Lind v. Jones, 104 Minn. 302, 116 N. W. 579.

Judgment affirmed.