## LOUIS ROBERGE v. CAMBRIDGE COOPERATIVE CREAMERY COMPANY.

79 N. W. (2d) 142.

November 2, 1956—No. 36,927.

*Harold Jordan* and *Doherty, Rumble & Butler,* for appellant.
*Heinrich J. Kuhlman,* for respondent.

KNUTSON, JUSTICE.

This is an appeal from an order denying defendant's motion in the alternative for amended findings of fact and conclusions of law or for a new trial.

Defendant is a cooperative creamery located at Cambridge, Minnesota. In the spring of 1950 it decided to enlarge its operations by opening a milk bottling plant in Minneapolis for the purpose of engaging in the business of selling bottled milk in that city in order to encourage its farm patrons to engage in the production of Grade A milk. None of defendant's officers or directors had any experience in that business, nor did its manager, Stanley G. Lindgren. Plaintiff had a great deal of experience in that line and many contacts with dealers which would assist defendant in building up such a business. Consequently, defendant contacted plaintiff, and, after some negotiations, plaintiff went to work for defendant. On September 18, 1950, Lindgren handed plaintiff a letter which read as follows:

"Cambridge, Minn.
"Sept 18, 1950

"Louis Roberge
3504 Harriet Ave. So.
Minneapolis, Minn.
"Dear Sir:

"I have talked to my board of directors and they are agreeable to your proposition of Exclusive Sale of Dairy Products from the bottling plant we are putting in Minneapolis for Hennepin, Anoka, and Ramsey Counties.

"We agree to pay 1c per quart on Milk, 4c per quart on Cream and 1c per pound on Butter and 1c per unit on other Dairy Products.

"Prices on Dairy Products shall be Prevailing Dairy Store Prices—all prices and credits subject to our approval.

"This agreement to be cancellable by one year's written notice by ourself or you.

"The Trade Names 'Blue Ribbon Dairies' and 'Sunshine Rich' shall remain your property.

"We will have our attorney meet your attorney and draw this agreement up to proper form later.

"Yours respectfully,

"Stanley G. Lindgren

Manager

Cambridge Co-op. Cry. Co."

It was the intention of the parties that a formal written contract should be executed, but that was never done. Initially plaintiff did a great deal of work to assist defendant in setting up a plant. He helped secure a building, which defendant originally intended to purchase, but later plaintiff assisted defendant in procuring a lease therefor; he arranged credit, assisted in purchasing necessary machinery and equipment, and helped with its proper installation; he assisted defendant in procuring approval of the plant by city and state authorities; and he rendered many other similar and preliminary services. After the plant started operating, he not only procured all the customers which defendant eventually did business with but assisted in making special deliveries; he took orders at his home which were relayed to defendant; he helped in settlement of union contract negotiations; he made up and sometimes paid for advertising; he entertained customers; he used his own automobile at his own expense; and in other ways he helped get the business launched.

The business was not profitable. At the end of 1951, plaintiff was discharged. Up to that time he had been paid $3,550. He claimed that he had earned $7,611.84 commission during 1951. He then commenced an action to recover the additional sum of $4,061.84 and other money which he claimed for a breach of contract. In that action he contended that the letter set forth above constituted an express contract between the parties. Defendant claimed that Lindgren had no authority to write the letter and that there was no express contract. The trial court found that there was no express contract but that plaintiff was entitled to recover the reasonable value of his services. On appeal to this court we remanded the case on the ground that, where only an express contract is pleaded, recovery on the theory of

implied contract or unjust enrichment cannot be sustained. Roberge v. Cambridge Co-op. Creamery Co. 243 Minn. 230, 67 N. W. (2d) 400. We reserved the right to plaintiff to amend his pleadings if he saw fit and remanded the case to the trial court to permit plaintiff to do so and for the taking of additional testimony on that theory if the court granted plaintiff's motion to amend his pleadings.

Thereafter plaintiff did amend his pleadings so as to allege an implied contract and unjust enrichment. The court received considerable additional evidence on those theories and thereafter made new findings of fact, conclusions of law, and order for judgment awarding to plaintiff $3,050 in addition to what he already had been paid. A motion for amended findings or a new trial was denied, and this appeal followed.

The questions presented here are whether the evidence sustains the court's findings that recovery could be had on the theory of an implied contract or on the theory of unjust enrichment. If the evidence sustains a recovery on either theory, there must be an affirmance.

In considering the questions involved in this case, it is well to keep in mind the distinction between a contract implied in fact and a quasi-contract. The essential differences between contracts implied in fact and quasi-contracts, which sometimes are referred to as contracts implied in law and are based on the right to recover for unjust enrichment, are sufficiently discussed in McArdle v. Williams, 193 Minn. 433, 258 N. W. 818; Dusenka v. Dusenka, 221 Minn. 234, 21 N. W. (2d) 528; and Roske v. Ilykanyics, 232 Minn. 383, 45 N. W. (2d) 769.

■ A contract implied in fact is in all respects a true contract. It requires a meeting of the minds the same as an express contract.[1]

■ As in the case of an express contract, a material misrepresentation prevents the establishment of a contractual relationship for the reason that there never has been a meeting of the minds.[2]

[1]Restatement, Contracts, § 5; 4 Dunnell, Dig. (3 ed.) § 1724; Lombard v. Rahilly, 127 Minn. 449, 149 N. W. 950; Town of Balkan v. Village of Buhl, 158 Minn. 271, 197 N. W. 266, 35 A. L. R. 470.

[2]Peet v. Roth Hotel Co. 191 Minn. 151, 253 N. W. 546; Restatement, Contracts, § 475.

■ The question of whether there is a contract to be implied in fact usually is to be determined by the trier of facts as an inference of fact to be drawn from the conduct of the parties.[3]

■ Mutual assent may be manifested wholly or partly in written or oral words or partly in written or oral words and partly by the conduct of the parties.[4] It may be partly expressed in words and partly implied in fact from acts and circumstances.[5]

■ In the first trial of this case, defendant took the position that Lindgren had no authority to write exhibit A, which was the letter set forth above, and that as a consequence there was no express contract. Lindgren testified that exhibit A was written and delivered to plaintiff in order that he might have something to show prospective customers. Lindgren's testimony in part, in that respect, was as follows:

"Q. What were the talks that you had with Mr. Roberge before you signed that letter and mailed it?

"A. Well, Mr. Roberge did not have any contract, and he had already started to feel out the trade, to prospective customers, wholesalers, whatever you want to call them, to try to work up an account, so that by the time that we got our equipment installed and ready to go we would have some customers, but due to the fact he didn't have anything to show them he wanted a letter to show that he had a source of supply.

*     *     *     *     *

"Q. Did you say anything to him about whether you did or did not have authority to make a contract with him?

"A. I told him I did not have authority to make a contract. We could go ahead and prepare something that would be agreeable with him and then present it to the board, and between the board and the attorney of the creamery, and between the attorney for Mr. Roberg—but we never got that far.

---

[3]Lombard v. Rahilly, 127 Minn. 449, 149 N. W. 950.

[4]Restatement, Contracts, § 21; Zieve v. Holstad Coffee Co. 198 Minn. 580, 270 N. W. 581; Randall Co. v. Briggs, 189 Minn. 175, 248 N. W. 752.

[5]Dybvig v. Minneapolis Sanatorium, 128 Minn. 292, 150 N. W. 905.

"Q. And in your discussion before that letter was prepared was there something said about some condition when the creamery got on a paying basis, or the bottling plant?

"A. Yes, he said 'I want to help you as much as I can.' Mr. Roberge worked very hard, and he says 'We want to get this thing on a paying basis just as soon as we can,' and he says 'Until that time I will try to get along with just what I need to drive my car and some for my home,' and we agreed on giving him $100 checks.

"Q. In other words, he said he would take just expenses until the creamery was on a paying basis?

"A. That's right. We expected to go on a paying basis in about six or eight months.

"Q. And did you ever realize that expectation?

"A. No, we did not."

In the second trial defendant took a different tack. When plaintiff rested, counsel for defendant stated its position as follows:

"* * * The primary contention of the plaintiff is that he went out and procured business for the defendant, that is, store accounts, and he is entitled to be paid a reasonable compensation for that service plus the time he spent in assisting the defendant in getting its plant in operation. So far as the time spent by the plaintiff in assisting the defendant in getting its plant established, we have no dispute with the plaintiff that he is entitled to a fair compensation for the productive work that he did in assisting the defendant to get its plant established. As to the services of the defendant in procuring these accounts, that is the service which the plaintiff performed in procuring these accounts, we say plaintiff is not entitled to any compensation. He was on his own as far as that part of his service was concerned. He represented to the defendant that the business he procured was at prevailing dairy store prices, and that it was a paying business that they could accept and at least not lose money on it, and the defendant, who knew nothing about that business or the distribution of fluid milk in Minneapolis, accepted the business that he procured for the defendant on this representation."

It is apparent that defendant's whole defense rests on the claim that plaintiff was required to procure customers based on prevailing prices for milk in the city of Minneapolis; that he sold milk at prices lower than prevailing prices and represented to defendant's manager that they were prevailing prices; and that by virtue of such misrepresentation no contract came into being for the reason that there never was a meeting of minds. Defendant now concedes that plaintiff is entitled to retain the $3,550 which he was paid during the time he was employed as compensation for services rendered in setting up the plant and for work done preliminary to the commencement of actual business. That, too, is contrary to the position taken by defendant at the first trial and indicates, at least, that the entire contract was not embodied in the letter, exhibit A.

In the first trial, Lindgren testified that defendant's board of directors and officers never saw exhibit A. He stated that he did not discuss the letter with them. In that regard his testimony is:

"Q. And was that letter ever taken up with the board of directors of the creamery company?

"A. No, it was not.

"Q. Before September 18?

"A. No, it was not.

"Q. Or on September 18?

"A. No.

"Q. Or at any time after September 18?

"A. No, I had forgotten about it.

"Q. And until this lawsuit was started had you ever discussed that letter with any member of the board of directors?

"A. No, I hadn't.

"Q. Or any officer?

"A. No, I hadn't.

"Q. Or any stockholder of the creamery?

"A. No, I hadn't.

\* \* \* \* \*

"Q. Did you ever tell any member of the board of directors or any officers of the creamery company about this Exhibit A, that is the letter of September 18, 1950?

"A. No, I hadn't.

"Q. So far as you know did they know anything about it until after this suit was started?

"A. No, they did not."

On redirect examination he testified as follows:

"Q. Now, you have given some answers on cross examination that are not definite. I think you used the language that you talked contract to the board at some length. I want to know, did you ever talk to the board about the figures that are in the September 18 letter that you sent?

"A. I did not talk about the September letter. * * *

"Q. Did you ever talk to the board about paying Roberge 1c per quart on milk?

"A. Oh, yes.

"Q. What did you say to them?

"A. I said that Mr. Roberge has an agreement, or has a piece of paper—let's put it that way—which is his side of the contract, let's call it, or whatever you want to call that piece of writing, and he wants 1c a quart, and whatever the rest of it is, but we want to get on a paying basis before we go on paying him anything, and before we go paying him this price, or whatever you want to call it, we will have a meeting for the board to sign an agreement of this kind, but that date was never reached due to the fact we never got on a paying basis."

Nowhere does Lindgren say that he stated to the members of the board or discussed with them any requirement that plaintiff sell at prevailing prices before he would become entitled to compensation. Inasmuch as he claimed that he had no authority to write exhibit A and further claimed that the board of directors and officers never saw exhibit A, it is difficult to see how that exhibit now can be claimed to constitute the contract between the parties. The court could well find that defendant knew that plaintiff expected to be paid a commission, as stated to its directors by Lindgren, and that defendant accepted his services with that understanding. The least that can be said is that the court was not compelled to accept Lind-

gren's testimony as stating the whole understanding between the parties.

Even if we assume that exhibit A reflects the terms of the original agreement of the parties, it is entirely possible that as time went on the parties conducted themselves in such a manner, in disregard of their original intentions, as to permit an inference that plaintiff was to be paid the reasonable value of his services. The following language in Benedict v. Pfunder, 183 Minn. 396, 400, 237 N. W. 2, 4, is of interest here:

"* * * it frequently happens, as on plaintiff's evidence it may have happened here, that, starting with an express contract, the parties soon and plainly, although tacitly, deliberately leave their original compact behind and so conduct themselves, one performing services or rendering benefit to the other which the latter accepts, that a promise to pay may or even must be implied from their conduct. That is, their actions rather than their words produce implications from which a new contract appears."

Defendant was engaging in a new and highly competitive business. It was necessary to procure customers in order to operate. Many difficulties that could not have been foreseen at the outset were encountered. Looking at the case retrospectively, it is evident that the business was a losing venture from the start, but the losses were not all attributable to the prices at which milk was sold, nor can they all be chargeable to plaintiff. On the evidence in this case, the court could well find that defendant's manager knew at all times the prices at which milk was sold and that he took an active, if not controlling, part in fixing those prices. Certainly he took an active part in determining at what price milk should be sold to those customers where it was let on bids. Under those circumstances, there is ample evidence that, regardless of what the original intention of the parties was, as operations continued and difficulties were encountered, the parties so conducted themselves that it must be inferred that defendant expected to pay plaintiff the reasonable value of his services. In the first trial, Lindgren testified that plaintiff was to receive his expenses until the creamery was on a paying basis and that "We

expected to go on a paying basis in about six or eight months." It must be conceded that plaintiff continued to work long after that period of time and that defendant continued to accept his services.

The court made no specific findings as to whether defendant was induced to accept the orders plaintiff obtained relying on plaintiff's representations that such orders were based on prevailing prices and whether such representations were untrue. In its memorandum, made part of its findings, the court did say:

"Assuming that the plaintiff sold these products at a lower price than was practical, it still does not answer the question of whether he was entitled to compensation for the work he did. * * *

"As a matter of equity the Court has assumed that the plaintiff was partly at fault in selling the milk at a price somewhat less than it should have been sold at."

Defendant seeks to construe these two statements to mean that the court found that there was a material misrepresentation of fact which would as a matter of law vitiate any contract. While it would have been better if the court had made a specific finding on this issue, we do not believe that the statement in the memorandum can be construed to mean what defendant says it means. While the court made no specific finding on this issue, it did deny defendant's motion to amend the findings to include, among other things, the following:

"That in addition to the work above described [which referred to work done prior to the commencement of the operations] plaintiff through his own efforts and while acting on his own time procured for defendant numerous outlets for sale of its bottled milk, principally to stores in Minneapolis; that defendant was induced to accept the prices obtained by plaintiff and did accept them in full reliance upon plaintiff's representations to defendant that said prices were adequate when plaintiff knew or should have known them to be inadequate; that under the circumstances there was no implied promise by defendant to pay plaintiff for such services and no unjust enrichment."

We have frequently held that denial of a motion to amend findings is equivalent to a contrary finding.[6]

The evidence in this case would sustain a finding that defendant had failed to establish a misrepresentation that would avoid the contract. That being true, a denial of defendant's motion to amend so as to find a misrepresentation is equivalent to a finding that there was no misrepresentation or that the misrepresentation was subject to the qualification that defendant could, if it chose to do so, sell at a lower price, which it did. In order to establish its defense, defendant relies almost entirely on the testimony of Mr. Lindgren. His testimony is far from satisfactory, and his testimony at the first trial and that at the second trial are inconsistent and irreconcilable in many respects. Certainly the position taken by defendant at the two trials can hardly be reconciled.

■ Furthermore, the court could have found that the agreement to sell at prevailing prices was subject to the provision that prices were at all times subject to the approval of defendant. If the letter reflects the terms of the implied agreement, or a part thereof, then all parts of it must be taken into consideration. The evidence shows that defendant's manager visited places where plaintiff sold its milk. He observed the price at which milk was sold by such places. He also visited competing places of business and observed their selling price. A substantial part of the milk sold by defendant was sold to the Soldiers Home and the Veterans Hospital. All of this milk was sold on competitive bids. In submitting bids, defendant's manager, Lindgren, took an active part in determining what bids should be submitted. In that respect, he testified as follows:

"Q. Wasn't your half-pint business a substantial part of your business with the Veterans' Administration and the Soldiers' Home?

"A. Yes, it was.

"Q. Do you deny that Mr. Roberge consulted you respecting the bids that were made for the Soldiers' Home and the Veterans'?

"A. Oh, we made them out together.

[6]Blodgett v. Hollo, 210 Minn. 298, 298 N. W. 249; Kiebach v. Kiebach, 227 Minn. 328, 35 N. W. (2d) 530.

"Q. And isn't it a fact that the prices at which you got the bids were very close to the prices of other bidders?

"A. That's right."

Lindgren testified that with respect to such sales plaintiff agreed to accept a smaller commission. He did qualify that statement by adding "after we get on a paying basis."

The burden rested on defendant to establish its defense. There is absolutely no evidence to show what prevailing prices were in selling milk on bids. The evidence with respect to prevailing prices on other milk sold is far from conclusive. The case presents questions of fact in determining, first, what the terms of the contract were, and, second, if the contract intended to include a provision that plaintiff was to sell milk only at prevailing prices, did plaintiff violate that agreement and make such misrepresentations to the defendant that there could be no meeting of the minds. We must hold that the court has found against defendant on both these issues and that the findings of the court are sustained by the evidence.

Having determined that there was no such misrepresentation as to avoid the contract, the court could find that the low prices obtained by plaintiff did affect the value of his services to defendant. It would seem that the court's memorandum reflects that thought rather than the idea that there was such a misrepresentation as to avoid a contract.

■ The only question that then remained was to determine the reasonable value of the services. Plaintiff testified as to what he considered his services to be worth. Other witnesses engaged in a similar business testified as to what they paid employees engaged in soliciting business. This case is one where the reasonable value of services cannot be measured by any mathematical formula. The court took into consideration the price at which plaintiff obtained orders. It was in that connection that the court referred to sales at prices lower than they should have been. It was proper for the court to take price into consideration in determining the reasonable value of plaintiff's services. Defendant offered no evidence on value; it stood fast on the claim that plaintiff was entitled to receive no

compensation except that already paid him. We think that the court has arrived at a figure which is fair and is reasonably sustained by the evidence.

■ The trial court determined that plaintiff was entitled to recover on the theory of a contract implied in fact and also on the theory of a quasi-contract or unjust enrichment. Ordinarily there is no need of resort to the latter theory when the evidence sustains a recovery on the theory of a contract implied in fact. Recovery on the theory of quasi-contract is permitted where there is no actual contract, express or implied in fact, and it would be unjust to permit defendant to receive the benefit of plaintiff's services without compensating him for them or where there has been such a breach of a contract by one party that the other may choose to rescind and recover in quasi-contract.[7] Inasmuch as we have determined that the evidence sustains the court's finding permitting recovery on the theory of a contract implied in fact, we need not determine whether recovery on the theory of quasi-contract also is sustained by the evidence.

Affirmed.

[7]See, Stark v. Magnuson, 212 Minn. 167, 2 N. W. (2d) 814; 5 Corbin, Contracts, § 1104; 5 Williston, Contracts (Rev. ed.) § 1454; Woodward, Law of Quasi Contracts, §§ 260 to 262.