MARY BALAFAS, INDIVIDUALLY AND AS SPECIAL
ADMINISTRATRIX OF ESTATE OF MICHAEL M. BALAFAS, v.
CHRIS BALAFAS AND ANOTHER, ADMINISTRATORS OF
ESTATE OF MICHAEL M. BALAFAS, AND OTHERS.

117 N. W. (2d) 20.

July 27, 1962—No. 38,504.

268

William E. Crowder and Harry H. MacLaughlin, Jr., for appellant.
Robins, Davis & Lyons and Sidney S. Feinberg, for respondents.

KNUTSON, CHIEF JUSTICE.

This is an appeal from an order of the district court denying plaintiff's motion for a new trial and from the judgment entered pursuant to the court's order.

The action is brought for an accounting seeking to establish that certain property acquired jointly by two brothers, Chris and Michael M. Balafas, over a lifetime of working and dealing together constituted partnership property and that one-half thereof, upon the death of Michael M. Balafas, belonged to his estate. The court found that the property acquired by the brothers was considered partnership property during their lifetime but that there was an agreement, implied in fact, between them that upon the death of one the survivor would be the owner of all such joint property.

The appeal falls mainly into two separate aspects, namely: Does the evidence sustain the court's finding that there was an agreement, implied in fact, that upon the death of one of the brothers the property acquired by them jointly during their lifetime should belong to the survivor, and, if so, are there any legal impediments to the consummation and enforcement of such agreement? We will consider these in order.

■ Michael M. Balafas, referred to hereinafter as Mike, came to this country from Greece in 1907. He had about a second-grade education. In 1911, his brother Chris came from Greece and joined him in Stillwater, Minnesota, where they operated a shoeshine and shoe-repair business. They continued in business in Stillwater for about 25

years, after which they discontinued that business. They left Stillwater, Mike obtaining work in St. Paul and Chris in Minneapolis. Eventually they again went into the shoe-repair business in Minneapolis in 1941. At that time they purchased a house with an attached shop from which they operated their business.

Apparently to begin with they split the proceeds of the business evenly. Early in their business activities they began to purchase stock out of the joint fund of the brothers, putting most of the stock in the name of Chris. After leaving Stillwater they again began purchasing stock when business picked up, apparently each putting up half of the money, although it appears that more consistently they purchased the stock out of the joint fund. Practically all of the stock was purchased in the name of Chris. They made their income tax returns on a partnership form. Over all the years that they were in business together there was never any division of profits in the usual sense. Their living expenses, most of the money they spent for stock, and all other disbursements were made out of the joint fund.

Mike married plaintiff, Mary Balafas, in 1942. She had an 8-year-old daughter by a former marriage, and after her marriage she moved in with Mike and Chris in the rooms back of the repair shop, where all four of them lived until the daughter married in 1950. Existence in the household may be characterized by its frugality. Mary was given a small sum of money to run the house, and, in addition to doing the housework, she helped in the shop. She also kept what books they had, under the direction of Mike. Chris never did learn to read or write, so the business affairs were conducted largely by Mike.

In 1952, the property from which they operated was sold and a new home purchased in south Minneapolis out of the joint funds, title being taken in the names of Mike and Chris as joint tenants.

In 1956, a niece of the brothers, Stamata Balafas, came to this country from Greece and moved in with the family. She continued to reside on the premises until the time of the trial. A nephew, Matheos Balafas, came here from Greece in 1956 and stayed with them for about a year.

On September 26, 1959, Mike died after being ill with cancer for about 3 years. The property which the two brothers had amassed,

largely corporate securities, amounted roughly to the sum of $700,000 at the time of Mike's death. The securities they held were either in the name of Chris or in the name of Mike and Chris as joint tenants. Shortly after Mike's death, Mary Balafas signed and filed a petition for the probate of Mike's estate, and his will was admitted to probate, but the estate, excluding the property owned jointly by the two brothers or in the name of Chris, amounted to only a nominal sum. In 1960, Mary was appointed special administratrix of Mike's estate to bring this action. She claimed that all the assets amassed during Mike's lifetime were purchased with partnership funds and that upon Mike's death one-half thereof belonged to his estate.

At the outset of the trial it was stipulated that Mike and Chris were engaged in a partnership during the time involved and that up to the death of Mike the assets acquired by the brothers were acquired with partnership funds. In addition to the facts stated above, there was other evidence that tended to establish the agreement found by the court. Oliver Eielson, a stockbroker who had handled the brothers' business for about 16 years prior to Mike's death, testified that he had asked Mike why most of the stock was in Chris' name. Mike replied that he did not want his wife, plaintiff herein, to get those stocks.

Maurice G. Carlson, a banker who had many dealings with the brothers over 10 or 12 years and who was familiar with the fact that several accounts and savings certificates had been created in the names of the brothers as joint tenants, testified that he asked Mike why they were so held and that Mike stated that "it was to save probate."

During 1953 and 1956 the two brothers executed joint wills. They retained William F. Thiel, an attorney at law in Minneapolis, to prepare the wills for them. Thiel testified that Mike was quite concerned for Chris should he (Mike) die first. A memorandum in Thiel's file, prepared at the time he was asked to draw their joint wills, stated that they wanted joint wills, that is, similar wills, in which they would leave everything to each other. Mike's first will, drawn in 1953, which was consented to in writing by Mike's wife, Mary, left his property in trust, with the income to go one-half to Mary and one-half to Chris, with provision for the remainder to go to relatives in Greece.

In 1956, the two brothers executed new wills in which Mike made

a specific bequest of $10,000 to Mary and left the remainder of his estate to Chris. Chris' will left everything to Mike. Eielson, the stockbroker, testified that when Mike told him of the provisions of the new will he had some discussion with Mike about it. He testified:

"In '56. He came into the office, and he told me he had this new will prepared, and he said, 'I am going to leave everything to Chris,' and I says, 'Well, Mike, that isn't right.' I says, 'You certainly want to leave some to your wife,' and he says, 'No, I am not going to leave her anything. I don't want to leave her anything.'"

In addition to the above testimony there is evidence of financial transactions in Mike's later years which add support to a finding that Mike planned that Chris should take all the property in Chris' name or in their joint names.

In 1957, a $50,000 savings certificate was procured from joint funds in the name of Mike in trust for his niece, Stamata Balafas; another was procured in the name of Mike or Mary Balafas for $10,000; and a savings account was opened for Mike in trust for Matheos Balafas. A few days before his death, Mike instructed Chris to take $50,000 from joint funds and place it in Mary's account. He had also set up a checking account of more than $4,000 in her name, and she received $3,400 cash from Chris for Mike's last expenses and funeral. In other words, during the last 2 years of his life, Mike gave Mary some $64,000, in addition to which she received $3,400 after his death. If he had not intended to leave the balance of his property which was already in the name of Chris or in the names of the two brothers as joint tenants to Chris upon his death, it is obvious that it would have been unnecessary to make these provisions for his wife, Mary. The only rational implication from all the facts taken together is that he intended to leave the securities that were carried in Chris' name or in the names of himself and Chris jointly to Chris upon his death, and the will of Chris leaving everything to Mike implements this conclusion that the brothers intended the survivor to have the securities which they owned jointly upon the death of one.

There is also evidence which shows that the relationship between Mike and Mary was at times quite strained. They argued frequently

over the upbringing of Mary's daughter by a former marriage. Mary resented Chris' living in the house with them, and apparently Chris and Mary did not get along together. They frequently had disputes over money and property. In 1946 Mary left Mike and went to stay with her mother in East Chicago, Indiana, where she remained for about 2 months. While she claimed at the time of the trial that she did not know that much of the property was in Chris' name, she admitted on cross-examination writing a letter from East Chicago to Mike in which she stated:

"There is only one way I could live with you again. If you buy a new home, I mean more modern home than the one you have, you will have to buy the house in your name and in my name so that if you die before I do I won't get kicked out of the house like a bum. *The way things stand now if you go first Chris gets everything,* and if Chris dies first everything goes to the State for a whole year." (Italics supplied.)

While Mary attempted to excuse the writing of this letter by saying that she must have been angry, the trial court was justified in finding that she knew what she was doing at the time she wrote it. When she returned to Mike everything seemed to be fine for a while, but no property was transferred into her name, the brothers continuing to operate as they had done before.

In 1948, Mary again went to East Chicago, where she attended her mother's funeral, and she again wrote letters to Mike demanding that her name be on some kind of property as a condition for her returning. She did return, however, and no property was put in her name. She admitted fighting with her husband about money and property and at one time consulted an attorney about procuring a divorce.

In spite of her denials at the time of this trial, the evidence shows quite clearly that she knew, during all the time that she was living with Mike, how the property was carried and that none of it was in her name. Even the house they lived in was in the names of Mike and Chris as joint tenants. Mary had attended school through the tenth grade and had a much better education than either of the brothers. She kept the books under the direction of Mike and could hardly have helped knowing how the securities were bought and carried.

After Mike's death, Mary talked to Oliver Eielson and stated to him that she had received everything to which she was entitled and more than she had expected and that she was satisfied. Apparently thereafter she saw an opportunity to acquire more, and, while many might feel that Mike could have been more liberal with Mary, the evidence clearly sustains the court's finding that the brothers intended that when one died the other would be the owner of all of the joint property carried in the name of Chris alone or in the names of Mike and Chris jointly. In fact, it is difficult to see how any other conclusion could be arrived at.

The question then arises: Are there any legal impediments to the enforcement of such agreement?

■ The nature and manner of proof of a contract implied in fact have been adequately discussed in prior decisions of this court. McArdle v. Williams, 193 Minn. 433, 258 N. W. 818; Dusenka v. Dusenka, 221 Minn. 234, 21 N. W. (2d) 528; Roberge v. Cambridge Co-op. Creamery Co. 248 Minn. 184, 79 N. W. (2d) 142; Roske v. Ilykany-ics, 232 Minn. 383, 45 N. W. (2d) 769.

In the Roberge case we said (248 Minn. 188, 79 N. W. [2d] 145):

"A contract implied in fact is in all respects a true contract. It requires a meeting of the minds the same as an express contract.

"As in the case of an express contract, a material misrepresentation prevents the establishment of a contractual relationship for the reason that there never has been a meeting of the minds.

"The question of whether there is a contract to be implied in fact usually is to be determined by the trier of facts as an inference of fact to be drawn from the conduct of the parties.

"Mutual assent may be manifested wholly or partly in written or oral words or partly in written or oral words and partly by the conduct of the parties. It may be partly expressed in words and partly implied in fact from acts and circumstances."

The difference between a contract implied in fact and an express contract lies mainly in the manner of proof. In Lombard v. Rahilly, 127 Minn. 449, 450, 149 N. W. 950, we said:

274

"* * * A contract implied in fact requires a meeting of the minds, an agreement, just as much as an express contract. The difference between the two is largely in the character of the evidence by which they are established. It is sometimes said that a contract implied in fact is established by circumstantial evidence. * * * The question whether there is such a contract is usually to be determined by the jury as an inference of fact."

Once a contract implied in fact is sufficiently established, it is as valid as any other contract.

■ Plaintiff contends that, inasmuch as the parties have stipulated and the court has found that the property jointly acquired and owned by the brothers during Mike's lifetime was acquired with partnership funds and held as partnership property, upon Mike's death his share of the partnership property belonged to his estate under the Uniform Partnership Act, which is the law of this state. Minn. St. 323.37, subd. 1, reads in part:

"When dissolution is caused in any way, except in contravention of the partnership agreement, each partner, as against his copartners and all persons claiming through them in respect of their interests in the partnership, *unless otherwise agreed,* may have the partnership property applied * * *." (Italics supplied.)

Minn. St. 323.39 reads in part:

"In settling accounts between the partners after dissolution, the following rules shall be observed, *subject to any agreement to the contrary*: * * *." (Italics supplied.)

Minn. St. 323.42 provides:

"The right to an account of his interest shall accrue to any partner, or his legal representative, as against the winding up partners or the surviving partners or the person or partnership continuing the business, at the date of dissolution, *in the absence of any agreement to the contrary*." (Italics supplied.)

It is obvious that the rules governing accountings between partners upon dissolution and the rights of surviving partners are subject to agreements entered into between them which may be contrary to the

usual statutory rules established in the absence of such agreements. In Block v. Schmidt, 296 Mich. 610, 296 N. W. 698, the facts are quite similar to those now before us. With respect to the contention now under discussion, the Michigan court said (296 Mich. 620, 296 N. W. 702):

"* * * appellants' contention is not tenable that since all the property in suit was acquired by investments of partnership earnings, the property so acquired must be held under the uniform partnership act to belong to the partners, notwithstanding there were no creditors of the partnership, and notwithstanding the two brothers took title to the respective portions of their properties as above noted. The uniform partnership act does not provide in that particular an inflexible rule of law. Instead, the act expressly provides for cases wherein a 'contrary intention appears.' "

That is true here. The Uniform Partnership Act does not preclude an agreement between partners that upon the death of one the survivor or survivors shall be the owners of the partnership property.

■ It is clear that during his lifetime Mike could have disposed of his personal property as he saw fit, even if the effect of it was to diminish his spouse's marital interest upon his death.[1] In Van Devere v. Moore, 243 Minn. 346, 350, 67 N. W. (2d) 664, 667, we said:

"The determination of whether a transaction terminating the rights of a surviving spouse to either realty or personalty is fraudulent has been the subject of considerable confusion and inconsistency. Although there are decisions to the contrary, under the prevailing view an intent to limit or cut off a spouse's marital interest does not of itself render the transaction fraudulent. We agree with the majority view that intent or motive is not a sound basis for invalidating an otherwise valid transaction. In the leading case of Newman v. Dore, 275 N. Y. 371, 9 N. E. (2d) 966, 112 A. L. R. 643, the court held that the determination should properly rest on whether the transaction is *a real one or merely an illusory device,* sometimes referred to as a 'colorable'

[1]See, Annotations, 64 A. L. R. 466, 112 A. L. R. 649, and 157 A. L. R. 1184.

transaction. This rule has been repeatedly followed in New York and elsewhere. When considered in connection with all the facts and circumstances present in a particular case, the 'real or illusory' test serves as a meaningful guide."

While some courts have found difficulty with the disposition of partnership property on the death of one of the partners for the reason that it is frequently claimed that such dispositions are testamentary in character, the general rule followed by a great weight of authority is that an agreement between partners that the survivor shall be the owner of all partnership property is valid if untainted by fraud.[2] The general rule is stated in 40 Am. Jur., Partnership, § 312, as follows:

"A provision in a partnership agreement that on the death of one of the partners his interest in the partnership shall become the property of the other partners is not testamentary in nature, and the fact that the agreement is not executed according to the requirements of the statute of wills does not invalidate it."

While most of the cases dealing with this subject involve written agreements, the rule is as applicable to a contract implied in fact as to an express agreement once such contract is sufficiently established.

Plaintiff claims also that the contract is without consideration. The reciprocal promises of the partners furnish adequate consideration for the agreement. In In re Karlinski's Estate, 38 N. Y. S. (2d) 297, 301, the court said:

"* * * it is immaterial whether the transfer of partnership embodies a money payment, a reciprocal arrangement or a mere naked transfer by one to the other."

If the agreement here had provided that, upon the death of Mike, Chris would become the owner of all the property of the partnership upon payment to Mike's surviving spouse of the sum of $64,000, it could hardly be contended that this agreement would not be valid. While the payment to Mary was not made under the specific terms of the agreement, the effect of it was much the same. Not only were

---

[2]See, Annotations, 73 A. L. R. 983 and 1 A. L. R. (2d) 1265.

substantial provisions made for Mary but very substantial sums were set aside for others to carry out the wishes of Mike and Chris.

■ There are some bits of evidence which, taken alone, seem to be inconsistent with the court's finding that there was an implied agreement between these two men that upon the death of one the survivor would be the owner of the partnership property. Probably most important of these is the will drawn in 1953 wherein Mike placed his property in trust for specified purposes. However, if the evidence is viewed in its entirety, it seems clear that at least from the time of the execution of the last will both brothers intended that upon the death of one the other should be the owner of all the joint property. It is doubtful that either of these uneducated men ever had a clear legal concept of ownership of this property as partners. It is more likely that they always considered their joint property as if it were mutually owned by the two of them. It is hardly to be expected that they would observe all the legal niceties that might be found in an agreement between lawyers or even laymen having better educations. In determining what their intentions were, we must look to all the dealings between them and judge them as they are, not as they might have been. When we do that, it is clear that they intended that when one died the other should have the property acquired jointly and held in the name of Chris or in the joint names of Chris and Mike. No effort was ever made to divide the earnings annually or otherwise. All expenditures were paid out of the common fund, no matter for whose benefit it was paid. Even when Chris went back to Greece, where he remained for a considerable period of time, all his expenses were paid out of the joint fund. Nor can there be much doubt from the evidence that Mary, throughout her life with Mike, understood that upon the death of one of the partners the other would become the sole owner of the joint property. It must be conceded that if Chris had died first Mike would have succeeded to his interest in the joint property. The method they chose for accomplishing the purpose of having the survivor become the owner of all may not have been the best from a legal standpoint, but the evidence amply sustains a finding that they did have such intention.

Affirmed.