**Pamela GRYC, Respondent,**

v.

**Lyle LEWIS, et al., Appellants.**

**No. C9-87-389.**

Court of Appeals of Minnesota.

Aug. 25, 1987.

Vance B. Grannis, Jr., M. Cecilia Ray, Grannis, Grannis, Farrell & Knutson, South St. Paul, for respondent.

Dennis L. Briguet, Dennis L. Briguet and Assoc., West St. Paul, for appellants.

Considered and decided by NIERENGARTEN, P.J., and FOLEY and RANDALL, JJ., with oral argument waived.

## OPINION

FOLEY, Judge.

This case involves the construction of a cul-de-sac and the parties' understanding regarding compensation for property lost as a result of the construction. Marcella and Lyle Lewis appeal from a December 8, 1986 judgment finding them jointly and severally liable to respondent Pamela Gryc, under an implied agreement, for the reasonable value of land used. On appeal, appellants contend that the trial court erred in finding an implied agreement to compensate respondent for property lost as a result of the cul-de-sac. We affirm.

## FACTS

Sometime in 1981–82, a number of neighboring property owners in Mendota Heights first met to discuss platting of their respective properties. Appellants, respondent, respondent's father James Gryc and George and Marcia Lowe subsequently agreed to plat their property into Evergreen Knolls First Addition. Parcels owned by respondent, her father and Lowes form a contiguous rectangle of 24 acres to the south of appellants' property. Appellants' 1.78 acre parcel is fronted to the north by Wentworth Avenue and abutted directly to the south by respondent's property.

Prior to the platting of Evergreen Knolls, Wentworth Avenue provided the sole access to appellants' property. Appellants acknowledged that to adequately develop the southern portion of the property and ultimately divide the land into four separate residential lots, additional street access was necessary. Preliminary plans for the plat indicated that the only way appellants' interests could be served was by construction of a cul-de-sac that would connect the property to a street running through the center of the project.

Over the next two years, several meetings took place among the participants of the proposed platting. James Gryc testified that as the plat developed, it became clear that the access roads would not affect everyone's property equally. He stated that this was explained to the participants in the project, including appellants, and that an agreement was reached to compensate one another for any property lost if the plat were accepted by the city council.

> I definitely talked with the Lowes and [appellants] in the back hall of the City Courthouse and said, "Now if this platting is accepted, we'll compensate each other for the property that we lost." I gave up the full street along the Lowe's property so they compensated me for 50 percent of the street which they should have given up for this.

Q Now, were you talking directly to the Lowes when you said—

A I was talking directly to the Lowes and [appellants] were present there and they overheard.

Q Where was Pam when this discussion was taking place?

A She was there.

\* \* \* \* \* \*

Q Did you ever tell [appellants] what property, as it lies on the ground, actually was owned by you and what property was owned by your daughter?

A The property that it affected on the cul-de-sac belongs all to her.

Q Did you tell that to [appellants] at any time?

A Yes, yes.

George Lowe testified that he and his wife agreed directly with James Gryc to a compensation plan. He could not specifically recall whether the details of the plan

were discussed with appellants in his presence.

Respondent testified that she had several conversations with appellants regarding compensation for property she would lose to the cul-de-sac. She recalled one conversation with Marcella Lewis, her former school teacher, in the city courthouse:

> [Respondent]: I was in a conversational manner talking to Mrs. Lewis and I was saying how happy I was that I would be compensated for having Pamela Lane [the service road] and the cul-de-sac on my land because I was in need of money.
>
>      *     *     *     *     *     *
>
> Q Was [the statement] in connection [with] when you were there for one of these meetings that your father has described?
>
> A Yes.
>
>      *     *     *     *     *     *
>
> Q Did [Mrs. Lewis] say "We are not going to compensate you for this street"?
>
> A No.

Respondent could not specify the dates of these conversations, explaining that approximately 50 meetings had taken place among project participants, neighbors and various city officials. She explained that the cul-de-sac was not in her choice of design:

> Q If [appellants] had not wanted their property included in the platting, would you have had the cul-de-sac that's shown there but simply a shorter cul-de-sac for your property?
>
> A I would not have had a cul-de-sac at all. I would have had Evergreen Knolls go straight through.

James Gryc specifically recalled one occasion after a meeting where respondent brought up the subject of compensation. According to Gryc, appellants, present at the time, voiced no objection. Appellants both denied personally discussing the subject of compensation with respondent during the platting process. Lyle Lewis did acknowledge that an agreement for reimbursement of platting expenses had been reached with James Gryc in January 1985.

The development plan for Evergreen Knolls was approved by the city council on April 3, 1984 and excavation of the roadways began that summer. In total, at least 10,000 square feet of respondent's land was dedicated to provide the cul-de-sac. At least 3,400 square feet of appellants' land was dedicated for this purpose.

David Ross, the only expert to testify at trial, stated that the reasonable value of Evergreen Knolls property was $2 per square foot.

> The trial court concluded that
>
> the words, circumstances and conduct of the parties constitute a contract implied in fact to subdivide the property * * * and to fairly compensate those property owners who lost property due to access roads * * * which benefited the other property owners.

The trial court also concluded that although the creation of the cul-de-sac benefited all parties, respondent

> gave up a greater portion of her land than [appellants] and has a legal right to be compensated for same based upon the totality of the words, circumstances and conduct of the parties surrounding the transaction.

In its memorandum, the trial court additionally noted that while respondent was not present when George Lowe and James Gryc agreed that all landowners should be compensated for lost property,

> all of the circumstances surrounding the transaction indicate to the Court that James Gryc had some authority to speak on behalf of his daughter, and that the obvious intent of the understanding was to compensate all affected property owners who gave up land for use as a cul-de-sac.

Appellants were found jointly and severally liable to respondent in the amount of $13,200. This was based on the fair market value of $2 per square foot times 6,600 square feet of property, the difference between property dedicated by respondent (at least 10,000 square feet) and appellants (at least 3,400 square feet).

## ISSUE

Does the evidence reasonably support the trial court's findings and its conclusion that an implied-in-fact agreement existed between the parties to compensate respondent for property dedicated to creation of the cul-de-sac?

## ANALYSIS

Appellants did not move for a new trial. Accordingly, if the evidence reasonably supports the trial court's findings and the findings sustain the conclusions of law, the trial court will be affirmed. *Schatz v. Davis*, 354 N.W.2d 522, 524 (Minn.Ct.App. 1984) (citing *Gruenhagen v. Larson*, 310 Minn. 454, 458, 246 N.W.2d 565, 569 (1976)).

A contract implied in fact is one inferred from the circumstances and conduct of the parties. *Roberge v. Cambridge Co-op Creamery Co.*, 248 Minn. 184, 189, 79 N.W.2d 142, 146 (1956). A contract implied in fact is in all respects a true contract requiring a meeting of the minds. *Id.* at 188, 79 N.W.2d at 145. It differs from an express contract mainly in the manner mutual assent is proved. *Capital Warehouse Co. v. McGill-Warner-Farnham Co.*, 276 Minn. 108, 149 N.W.2d 31 (1967). The test for contract formation is an objective one. *Anderson v. Sommer*, 381 N.W.2d 22 (Minn.Ct.App.1986).

In its memorandum, the trial court cited two cases in support of its finding that an implied-in-fact contract existed: *Balafas v. Balafas*, 263 Minn. 267, 117 N.W.2d 20 (1962), and *Knaus Truck Lines v. Donaldson*, 235 Minn. 453, 51 N.W.2d 99 (1952). In *Balafas*, the court upheld the finding of an implied agreement to grant the surviving member of a partnership ownership of certain partnership funds. This was based on evidence that assets were acquired with partnership funds, a separate trust account for the decedent's wife, strained relations between the decedent and his wife, and evidence that almost all property owned by either partner was held jointly. Addressing a possible inconsistency caused by the decedent's first will, which placed the property in trust and divided the income between the surviving partner and the decedent's wife, the court commented:

*[I]f the evidence is viewed in its entirety, it seems clear that at least from the time of execution of the [most recent] will both [partners] intended that upon the death of one the other should be the owner of all the joint property. \* \* \* In determining what their intentions were, we must look to all the dealings between them and judge them as they are, not as they might have been.*

*Id.* 263 Minn. at 277, 117 N.W.2d 27 (emphasis supplied).

In *Knaus*, it was undisputed that an agency relationship existed. Determining initially that Knaus, the principal, had ratified the unauthorized acts of its agent, the court held that the agent had accepted the builders' counteroffer expressly terminating Knaus' option to purchase the property at issue. *Id.* 235 Minn. at 457, 51 N.W.2d at 102.

Appellants devote much of their argument to distinguishing *Knaus* from the present case, claiming that the trial court erred in finding an agency relationship between respondent and James Gryc and "using those relationships to weave Appellants into an implied agreement with Respondent." This claim is unpersuasive. While the trial court found that "James Gryc had some authority to speak on behalf of his daughter" and thus acted as her agent, it is clear that the court's decision is premised on principles of contract law, not agency law. Notably, none of the findings of fact incorporate aspects of agency law, only features of contract law.

When an implied contract is relied upon as the basis for legal relief and thus deduced from the circumstances, relationship and conduct of the parties, "it is not expected that the elements of a contract will be as vividly portrayed by the evidence as [by evidence of] an express contract." *High v. Supreme Lodge of World, Loyal Order of Moose*, 210 Minn. 471, 473, 298 N.W. 723, 725 (1941). Nonetheless, this does not relieve the plaintiff from his or her burden of establishing all essential contractual elements. *Id.* Moreover, "the

simple fact of benefit *without more* does not impose contractual liability." *Id.* at 474–75, 298 N.W. at 725 (emphasis supplied).

 Here, appellants have unquestionably received a benefit from use of respondent's land. By their own admission, the southern portion of their property could not have been divided and sold as residential lots without additional street access. The cul-de-sac was created to directly serve appellants' interests and was not respondent's choice of design. Evidence of benefit, however, was not the only evidence offered to support formation of an implied-in-fact contract.

James Gryc testified that appellants were present during a discussion he had with the Lowes regarding compensation for property lost to street construction. Although appellants did not directly participate in the discussion, they were aware of the compensation proposal and did not voice objection to the plan. In addition, respondent testified that when she told Marcella Lewis she was happy she would be receiving compensation for her land because she needed the money, Marcella Lewis voiced no objection. Appellants clearly dispute this evidence; however, the issue is essentially one of credibility. The trial court, as trier of fact in this case, is entitled to due regard in judging the credibility of the witness and will not be second guessed by this court. *See* Minn.R.Civ.P. 52.01.

Ordinarily, mere silence does not amount to an acceptance. However, when the relationship between the parties is such that an offeror is justified in expecting a reply or the offeree is under a duty to respond, silence will be deemed an acceptance. *See Holt v. Swenson,* 252 Minn. 510, 516, 90 N.W.2d 724, 728 (1958). Here, appellants received the street access they desired but only after respondent had agreed to dedicate land necessary to build the cul-de-sac. Given the irrevocable nature of the dedication, it was incumbent upon appellants to object if they believed compensation for unequal use of land was unnecessary or unfair.

## DECISION

The trial court's finding of an implied-in-fact agreement to compensate respondent for land used in constructing the cul-de-sac was reasonably supported by the record as a whole.

Affirmed.