# BEULAH B. LEUBA AND ANOTHER v. LEONE BAILEY AND ANOTHER.

88 N. W. (2d) 73.

December 27, 1957—Nos. 37,069, 37,187.

*Clifford F. Hansen, Samuel A. Warren,* and *Harry H. Peterson,* for appellants.

*Robb, Robb & Van Eps,* for respondents.

MURPHY, JUSTICE.

This is an appeal by defendants from a judgment of the District Court of Hennepin County. The case involves the issue of whether undue influence was exercised by the defendants on one Dr. William W. Shenk in connection with the execution of joint tenancy deeds to certain property in Minneapolis. Also involved is an appeal from orders of the court appointing a receiver for the purpose of managing and collecting rentals on the property during the pendency of the action. Both appeals are disposed of by this decision.

The plaintiff, Beulah B. Leuba, is the surviving daughter of Dr. William W. Shenk who died in Minneapolis, Minnesota, on May 2, 1955. The defendant Leone Bailey was the companion and housekeeper of Dr. Shenk for many years prior to his death. The defendant Samuel A. Warren performed legal services in connection with the transfer of certain real estate from Dr. Shenk individually to Leone Bailey and Dr. Shenk as joint tenants. The defendant Warren's interest grows out of a claim for legal services and certain advances made by him in connection with the transaction.

Mrs. Leuba instituted this action to cancel the deeds on the ground that they were procured by undue influence on the part of Miss Bailey. It appears from the record that the plaintiff's father was for many years a minister of the Gospel. He married Charlotte Marie Brooks of Byfield, Massachusetts, during the early period of his life when he was active as an evangelist. Two children were born of this marriage, Beulah, the plaintiff, and a son, David, both of whom survive. Sometime after his marriage Dr. Shenk left the evangelistic field and accepted the pastorate of a church in Tacoma, Washington, where he served for several years. In 1907 or 1908, the record is not clear as to the exact date, Dr. Shenk decided to leave his calling as a clergyman and to engage in mining ventures in Europe. He took his family from Tacoma to Byfield, Massachusetts, and left them with his wife's people while he went to Europe. After about six months in Europe, he returned to this country to pursue mining ventures here. His family did not see him from 1908 to 1916, during which interval he gave them little financial assistance. During this period Mrs. Shenk depended upon the aid of her relatives and friends and the sale of what little property she had to provide for herself and children.

It appears that Dr. Shenk returned to Massachusetts in 1916 intending to take over his family responsibilities, but certain circumstances, including his financial situation, prevented him from taking his family with him, when he returned west. The record is not clear as to Dr. Shenk's exact activities between 1916 and 1936, but it appears that at sometime in this interval, approximately 1918, he came to Minnesota to accept the pastorate of a Methodist church at Deer River. He held various pastorates in Minnesota thereafter, the last

being the Grace Methodist Church of Minneapolis which he finally gave up so that he could engage in osteopathic or chiropractic work. He was unable to qualify as an osteopath or chiropractic practitioner, but by 1936 he established himself as a naturopath, a profession which, it appears from the record, combined chiropractic and mental science ideas in the treatment of patients. It seems he enjoyed a modest success in this profession and purchased the property in which he carried on his practice at 3561 Minnehaha Avenue. He converted the second floor of the house on that property into two apartments which he rented out, and used the downstairs for his 'office and living quarters. While carrying on his practice as a naturopath he continued to send money to his family more frequently than he had in the past and in more substantial amounts. During all of this time he had kept up correspondence with members of his family, from which it appeared that he had every intention of being reunited with them when his financial circumstances would permit.

Leone Bailey came to live with Dr. Shenk in October 1936. Miss Bailey had no formal education beyond the eighth grade. Her mother, who was a talented musician, had taught music to Leone, and, prior to the time she came to live with Dr. Shenk, she engaged in the work of giving music lessons and had spent much of her time in taking care of her ailing parents. Her mother died in 1935 and her father died a year later. Her father was a friend and patient of Dr. Shenk. It was agreed between them that when Mr. Bailey died his daughter would work for Dr. Shenk. This arrangement was carried out. At the time Leone went to live with Dr. Shenk she was 36 years of age. She testified that Dr. Shenk had agreed to pay her $125 per month but that during the 19 years she spent with him she never received pay for the work she performed. She testified that she never had any money to spend for herself; that she received only her board and room and clothing which he purchased for her. She acted as a receptionist in his office and assisted in treating patients. She was his companion as well and accompanied him on social visits. They did their shopping together and took vacations together. In 1938, 1940, and 1941, Dr. Shenk paid Miss Bailey's expenses in the Minneapolis Business College to enable her to learn secretarial work. He believed that

eventually some of his mining investments would pay off and in that event he would need a well-trained secretary.

After leaving Massachusetts in 1916, Dr. Shenk did not again see any of his family until 1948 when his daughter Beulah visited him in Minneapolis. During the entire interval of Dr. Shenk's separation from his family he wrote frequent and regular letters expressing love and affection for his family, always in endearing terms. These letters continued until the time of Dr. Shenk's death. During his absence from the family he often sent money and gifts. During his more prosperous years he aided his children in getting an education and later paid the college expenses of two of his son David's children. He also helped Beulah purchase a car. He continued, however, to invest money in mining and in other speculative ventures. It was his expectation that these investments would one day make it possible for him to be reunited with his family.

After Beulah's visit in 1948, Shenk did not again see his family until 1951 when he was about 82 years of age. In July 1951, he became ill with asthma and was confined at the Swedish Hospital in Minneapolis. He expressed the feeling that a change of climate would help him and on his return from the hospital Miss Bailey arranged for him to go to Utah to visit with Dr. Farr where he could recuperate from his illness. Miss Bailey had met Dr. Farr, a former missionary for the Mormon Church, in Minneapolis, and had become a convert to his faith. Miss Bailey made all the arrangements for the trip to Farr's home and bought a plane ticket to Salt Lake City where Dr. Shenk was met by Dr. Farr. Dr. Shenk stayed at the Farr home for approximately seven days after which arrangements were made for Dr. Shenk to go by plane to Massachusetts where he could be with his family. Upon his arrival at Massachusetts it was discovered that he was suffering from both asthma and pneumonia and his son, David, whose wife is a registered nurse, took Dr. Shenk into his home. During his period of convalescence in Massachusetts he needed a great deal of care which was given by David, his wife, and Beulah. He remained in Massachusetts for approximately a month after which he returned to Minneapolis. During his stay in Massachusetts Dr. Shenk executed a power of attorney to Beulah and made a will leav-

ing all of his property to his family. These instruments have never been revoked and were in existence at the time of his death in 1955.

Shortly after Dr. Shenk's return to Minneapolis in the late part of August 1951, his wife became seriously ill and was hospitalized for several months. It was discovered that she was afflicted with cancer from which she died in 1952. The hospitalization and death of Mrs. Shenk resulted in a debt of $9,000, the immediate burden of which fell upon the children, Beulah and David. However, Dr. Shenk, in his letters to Beulah, made many promises that he would, as soon as the money was available, reimburse her and David for the expenses of Mrs. Shenk's last illness and burial. It appears that the greater portion of this debt was borne by Beulah through loans secured on the strength of her father's promises in his letters to her. The promises of Dr. Shenk to his daughter never materialized and with deteriorating health and his declining naturopathic practice, his financial condition became hopeless. His investments had proved worthless.

After the death of his wife, Dr. Shenk wrote many letters to Beulah in respect to his obligations. In her letters to her father Beulah expressed concern over the debts and her inability to pay them. At one point she suggested that the property at 3561 Minnehaha Avenue be put in her name and her father's name as joint tenants, thus giving her more security for the debts. The possibility of a mortgage on the house was also discussed as a means of obtaining money but neither the mortgage nor the joint tenancy was ever accomplished. The father continued, however, to reassure his daughter with respect to the debts and expressed the opinion that she had sufficient security in the form of the power of attorney and the will. Prior to the date of the trial of this action it appeared that Beulah had paid off the debts until there was remaining a balance of $4,500. These payments were made entirely from the salaries of Beulah and her husband.

The deeds attacked in this action were executed on March 22, 1955. It appears from the testimony of Mr. Warren, the attorney, that he was called to Dr. Shenk's home on March 18, 1955, and was asked to prepare a will leaving the house to Miss Bailey, but upon his advice it was decided that the transfer should be accomplished by use of joint tenancy deeds. These deeds were signed and acknowledged

on the morning of March 22, 1955, at the Shenk home. Warren testified that Miss Bailey was not present when the deeds were discussed. One deed was given by Shenk to a third party who in turn gave a deed to Dr. Shenk and Leone Bailey as joint tenants. On the same day, March 22, 1955, Dr. Shenk's bank account and personal property were placed in joint tenancy with Miss Bailey. The home and the bank account were substantially all the property Dr. Shenk had. Due to the fact that the taxes on the real estate had not been paid, the deeds could not be recorded. Attorney Warren took possession of the deeds and gave receipts for them to both Dr. Shenk and Miss Bailey. On May 5, 1955, he paid the taxes himself and had the deeds recorded.

According to the testimony of Miss Bailey, Dr. Shenk became seriously ill on approximately March 31, 1955. On April 2, 1955, she accompanied him to the Deaconess Hospital in Minneapolis where he was admitted as a patient and where he remained until April 20. Leone furnished the hospital with certain personal information and, upon being asked as to his nearest relative, she gave her name and described herself as his foster daughter. When asked for the names of other relatives, she gave the name of David, son, of Marblehead, Massachusetts. It does not appear that Leone notified any of Dr. Shenk's relatives of his illness and hospitalization. On the same day that Shenk was admitted to the hospital, his son, David, received a message to call the Deaconess Hospital in Minneapolis. The record does not disclose from whom David received this message. He promptly called his father and during the telephone conversation there was no mention of the fact that the property at 3561 Minnehaha Avenue had been put in joint tenancy with Miss Bailey or that it had been disposed of in any manner.

As bearing upon the manner in which the transfer of the property to Miss Bailey was accomplished, the plaintiffs place emphasis on the fact that the father's letter to his daughter advising her of the transfer was postmarked at 8 p. m. April 2, 1955, the same day he talked with his son, and bore the date of May 1, 1955. This communication, identified as exhibit 33, reads as follows:

"5-1-55

"My darling Baulah:

"Have just completed legal papers whereby Leone becomes owner of this place, and property, upon my decease, at 3561 Minnehaha Ave., Minneapolis, Minn. God bless and keep you in His love and care now and forever. Amen.

"Your Affectionate father,
"Wm. W. Shenk"

A copy of this letter had been photostated by Warren on April 4, 1955. The photostated copy had the words "(Copy for Leone)" at the top, apparently in Dr. Shenk's handwriting. Another letter bearing the same date, May 1, 1955, in the handwriting of Dr. Shenk, but unsigned, conveys the same information but is considerably longer. It does not appear that a copy of it was made for Miss Bailey.

Dr. Loren J. Larson, Dr. Shenk's attending physician while at the Deaconess Hospital, testified that Shenk's primary illness was a weak heart but "associated with this was senility due to his age and hardening of the arteries." At this time Dr. Shenk was 86 years of age. Dr. Larson further testified that while Dr. Shenk was in the hospital he suffered periods of irrationality "he * * * [had] a few days where he didn't know what day it was or what year it was." The hospital record of April 12, 1955, contains this notation: "Senility is main problem." Dr. Larson had attended Shenk from approximately December 1954 or January 1955, and testified that all during the interval from the time Dr. Larson first attended Shenk to the date of his death Shenk had suffered from senility due to age and hardening of the arteries.

Dr. Shenk was released from the hospital on April 20, 1955, and he returned to his home where he remained under the exclusive care of Miss Bailey until his death at approximately 6 a. m. on May 2, 1955. The certificate of death signed by Dr. Larson gave as cause of death "Arteriosclerotic cardiovascular" disease of "10 yrs" duration and "Senility" of "4 years" duration.

On May 3, 1955, Leone gave a mortgage in the amount of $2,000 covering the property at 3561 Minnehaha Avenue to Mr. Warren, the attorney who drew the joint tenancy deeds. These were recorded on

May 5, 1955, at 1:30 p. m. Before recording the deeds Warren paid the taxes in the amount of $350.78 by his personal check. At 3:50 p. m. on May 5, Warren recorded the mortgage which was assigned to one Gibbs on May 25. It is admitted by the defendants that there was no consideration given for the mortgage at the time it was executed on May 3. However, Warren contends it was given as security for the taxes he had advanced and in addition as security for services he might perform or advances he might make in the future. Miss Bailey says she is not sure why the mortgage was given but admits that she signed it.

The trial of the case commenced on May 9, 1956. On the third day of the trial, May 12, 1956, Warren obtained a satisfaction of the mortgage from his assignee, which satisfaction was filed on May 14, 1956. The satisfaction was obtained for the purpose of removing any impediment to Warren's testimony in the action by reason of M. S. A. 595.04, which makes a party to the action or person interested in the result of it incompetent to testify as to conversations with a deceased person.

After an extended trial the court submitted the following question to an advisory jury: "Did Samuel A. Warren and Leone Bailey exercise undue influence on Dr. William W. Shenk in getting him to give the deeds, Exhibits 3 and 4, on March 22, 1955?" By verdict rendered May 22, 1956, this question was answered in the affirmative.

■ The principal question presented is whether the evidence is sufficient to sustain the finding that the execution of the deeds was procured by undue influence. Undue influence is defined (19 Dunnell, Dig. [3 ed.] § 9949) as:

"* * * coercion, amounting to a destruction of one's free will, by means of importunities, flatteries, insinuations, suggestions, arguments, or any artifice not amounting to duress. It is ordinarily of an insidious nature, and exercised by one in close confidential relation to the victim. Exact definition is impossible. Each case must necessarily be determined largely by its own facts."

Authorities involving the issue of undue influence do not fall into fact patterns which provide an easy method by which the conflicting merits of this type of controversy may be weighed so as to determine

the results.[1] Courts do not undertake to define undue influence by fixed principles for the reason that such a definition might furnish a guide to the evasion of the consequences of the exercise of improper influence. 16 Am. Jur., Deeds, § 38.

■ It is recognized that the fact of undue influence may, and in many cases can only, be established by circumstantial evidence. The methods employed and the extent of the undue influence are immaterial if the effect has been to destroy the free agency of the donor. Prescott v. Johnson, 91 Minn. 273, 275, 97 N. W. 891, 892; Storer's Will, 28 Minn. 9, 8 N. W. 827.

While the evidence of undue influence must go beyond suspicion and conjecture and show not only that the influence was in fact exerted but that it dominated and controlled the donor's own free volition,[2] it may nevertheless be established by circumstantial evidence bearing on such facts as the gift of the donor's entire property, the confidential and dependent relationship between the donor and the donee before and after the making of the gift, the affectionate relations existing between the donor and his children to whom he is obligated financially as well as by family ties, and other circumstances which, although standing alone would not constitute undue influence, may, when considered together in connection with the whole evidence, support the verdict of the jury as to undue influence.[3]

■ In determining whether the verdict is supported by the evidence we are bound by the rule that a finding of the court will not be disturbed on appeal unless manifestly contrary to the evidence. In re Estate of Mollan, 181 Minn. 217, 219, 232 N. W. 1, 2.

The trial court is the finder of the facts and conflicts in the evidence are to be resolved in that court. This court interferes with the

---

[1]Prescott v. Johnson, 91 Minn. 273, 97 N. W. 891; In re Estate of Mollan, 181 Minn. 217, 232 N. W. 1; Graham v. Burch, 44 Minn. 33, 46 N. W. 148; Shaughnessey v. Shaughnessey, 140 Minn. 513, 167 N. W. 1046; In re Estate of Stephens, 207 Minn. 597, 293 N. W. 90; Borstad v. Ulstad, 232 Minn. 365, 45 N. W. (2d) 828; Davies v. Toms, 75 S. D. 273, 63 N. W. (2d) 406; Bentson v. Ellenstein, 215 Minn. 376, 10 N. W. (2d) 282; 19 Dunnell, Dig. (3 ed.) § 9951a, notes 64, 65.

[2]In re Estate of Reay, 249 Minn. 123, 81 N. W. (2d) 277.

[3]Prescott v. Johnson, 91 Minn. 273, 97 N. W. 891.

findings of the trial court only where the evidence taken as a whole furnishes no substantial support for them. Where, upon the evidence, reasonable minds might differ as to whether undue influence was exercised by the donee, the findings of the court, based upon a jury's answer to that specific question, may not be disturbed on appeal. In In re Estate of Reay, 249 Minn. 123, 129, 81 N. W. (2d) 277, 282, we said that:

"* * * The existence of undue influence is a question of fact, and the supreme court will not set aside the findings of the trial court as to undue influence unless they are manifestly and palpably contrary to the evidence as a whole, and this holds true even though this court might have determined otherwise if it had heard the case de novo."

Borstad v. Ulstad, 232 Minn. 365, 45 N. W. (2d) 828; In re Estate of Rasmussen, 244 Minn. 215, 69 N. W. (2d) 630; 20 Dunnell, Dig. (3 ed.) § 10243b.

■ In examining the record here the important principle we must have in mind is that the test of undue influence is not its effect upon a person of average intelligence and strength of character but its effect upon the person in question, taking into consideration his age, intelligence, health, and strength of character. In re Estate of Stephens, 207 Minn. 597, 293 N. W. 90. Here there was evidence from which the court could find that Dr. Shenk was 86 years of age; that he had been suffering from arteriosclerotic cardiovascular disease for ten years preceding his death and from senility for four years preceding his death; and that while in this condition he transferred all of his property to Miss Bailey despite his repeated assurances to his daughter that the same property was her security for the debts she had assumed in connection with his wife's medical and hospital bills. The circumstances surrounding the predated letter of May 1, 1955, which was postmarked April 2, 1955, was significant, as was the fact that in talking to his son on the latter date Dr. Shenk made no mention of the change in status of his property. Nor is it explained why there are two letters of May 1, 1955, one in the handwriting of Dr. Shenk and unsigned and the other typewritten and signed. There was also the unexplained conduct of Miss Bailey in representing

herself to the hospital as the foster daughter and nearest relative of Dr. Shenk; her delay in notifying members of his family as to his death; her giving of the mortgage immediately after his death on the property covered by the deeds in the sum of $2,000, which mortgage was given without consideration. The conduct of Mr. Warren in having prepared photostatic copies of the postdated letter of May 1, 1955, and the preparation and assignment of the $2,000 mortgage on the property immediately after Dr. Shenk's death carried unmistakable inferences of exculpatory conduct and an attempt by Miss Bailey and Mr. Warren to put the property beyond the reach of the decedent's children.

It is true that the record contains testimony of witnesses who said that they heard Dr. Shenk say that he intended to provide for Leone, but it is also true that the record contains letters, of about the same date, from Dr. Shenk to his family assuring them that he would make provision for them and that his property should be considered as security for the debts which they assumed.

A further discussion of the evidence in this case to demonstrate the correctness of the findings of the trial court would serve no useful purpose. It is for the trial court to determine the weight and credit to be given to the testimony of witnesses where such testimony is in conflict. 1 Dunnell, Dig. (3 ed.) § 411.

After a careful examination of the record we have reached the conclusion that the evidence, together with the inferences drawn therefrom by the trial court, is sufficient to sustain the conclusion reached by that court.

■ The defendants contend that there was prejudicial error on the part of the court in sustaining objections to the testimony of the defendant Samuel A. Warren with reference to conversations had with the decedent relative to the giving of the joint tenancy deeds prior to his death. The court sustained this objection holding that it was inadmissible under § 595.04, commonly referred to as the "Dead Man's Statute," which provides that:

"It shall not be competent for any party to an action, or any person interested in the event thereof, to give evidence * * * of or con-

cerning any conversation with, * * * a deceased * * * party or person relative to any matter at issue between the parties, * * *"

subject to certain exceptions not pertinent here.

The original complaint did not allege that Warren was a party to undue influence resulting in the giving of the joint tenancy deeds. It alleged that he was interested by reason of the fact that he "presently claims an interest in said property by virtue of a mortgage." The court, however, was of the view that the entire record established that Warren was an interested party and found that:

"* * * Samuel A. Warren paid from his own funds to the County Treasurer of the County of Hennepin all payable taxes and assessments against said property and claims a lien therefor against any interest defendant Leone Bailey may be adjudged to have in said premises. That said payment of taxes was without knowledge, information, or request [of the plaintiff Beulah Leuba or the administrator of the decedent's estate] * * * and not in performance of any direction received from the decedent, William W. Shenk, given during his lifetime. That such payment was made for the purpose of consummating the intentions of said Warren and Bailey as hereinbefore set forth."

At about the time the plaintiff rested, the defendant Warren moved that the case against him be dismissed, which motion was denied. The court thereupon granted the motion of the plaintiff to amend the pleadings so as to conform with the proof. This motion was granted on the ground that the evidence established that Warren had an interest in the issues involved by reason of the mortgage given to him by Miss Bailey, admittedly without a valid consideration.

The defendants admitted that a satisfaction of the mortgage had been obtained and filed during the course of the trial for the purpose of relieving Warren from any disability created by the statute which would prevent him from testifying as to the circumstances under which the decedent executed the joint tenancy deeds. After the court sustained the objection to Warren's testimony, the defendant made an offer of proof in which it was proposed that Warren's testimony would establish that he had been retained by Dr. Shenk as an attorney and that Dr. Shenk asked him to draw a will leaving the property at

3561 Minnehaha Avenue to Leone Bailey; that the doctor informed him that "in August of 1951 he had a will taken from him through the influence of his daughter Beulah; that he was not agreeable to that disposition, and that he wanted to make a new will to make it clear that the property there should go to Leone"; further, that Warren proposed that the transfer of the property should be made through a joint tenancy deed to which suggestion Dr. Shenk agreed saying that "he wanted the matter handled in such a way to be sure that the property would go to Leone Bailey"; that Dr. Shenk expected there would be trouble and he wanted the transaction handled in such a way that it would be certain that the property would go to Miss Bailey. The plaintiff was agreeable that the offer of proof might be read to the jury, but the defendants insisted upon calling Warren as a witness. The plaintiff's objection to this was sustained.

In holding that Warren was an interested party, precluded from testifying under § 595.04, the trial court was influenced by the evidence that Warren had acquired a $2,000 mortgage which Miss Bailey gave the day following the death of Dr. Shenk, which mortgage could only have validity in the event Miss Bailey prevailed in the action. During the first few days of the trial, apparently without the knowledge of other parties concerned with the trial, a satisfaction of the mortgage was secured from the assignee and placed in the possession of Warren. In his memorandum the court said: "It came to the attention of the Court when * * * [the attorney for the defendants] made the announcement in Court somewhere in the middle of the trial, offered the instrument in evidence and asked for a dismissal of the action as to Warren." This motion was denied, "the Court being of the opinion at that time, and now, that the same was not a good-faith satisfaction of the mortgage but that it was done only for the purpose of qualifying Mr. Warren to testify as to conversations had with Dr. Shenk, * * *."

The defendants argue that Warren should not have been disqualified to testify by virtue of being a party to the action because he was not a party to the specific issue of undue influence until after the testimony had been offered and rejected and the pleadings had been amended to conform to the proof. See, § 595.04. In Perine v. Grand

Lodge A. O. U. W. 48 Minn. 82, 90, 50 N. W. 1022, 1024, the court said that in order for a person to be disqualified as a witness by reason of an interest:

"* * * The interest must be pecuniary, certain, direct, and immediate, and not an uncertain, contingent, remote, or a merely possible interest."

It is apparent from the facts already recited that Warren had a direct personal interest in the outcome of the action. Moreover, the trial court found that the satisfaction of the mortgage given after the trial began "was spurious and not made in good faith and done for the purpose of evading the effect of Section 595.04 * * *." Aside from the fact that the record establishes that Warren had an interest in the outcome of the action and that his testimony necessarily related to the issue of undue influence, the circumstances occurring during the course of the trial supported the conclusion of the court that the assignment was not given in good faith. In Tretheway v. Carey, 60 Minn. 457, 62 N. W. 815, we held that the disability imposed by this statute was not removed by the assignment of a disqualifying interest when such assignment was not made in good faith.

■ The defendants further contend that the court erred in denying its motion for a new trial on the ground of newly discovered evidence based upon several affidavits of individuals who had known Dr. Shenk and whose testimony it is claimed could not have been discovered before the trial by the exercise of reasonable diligence. This motion was supported by affidavits to the effect that the doctor had told them at various times that Miss Bailey was "to have this house"; that if things turned out well the family would be well provided for from the proceeds of the publication of a book which he was writing; that he did not know "how he would be able to get along without Leone"; that his daughter had not been much help; that his life was "a very lonely one, and that his wife used him only as a meal ticket"; and that he wanted Leone to have the house because, as he stated, "I have taken care of my family away beyond anyone's expectations and they have never given me a particle of attention, * * *."

Recognizing the well-established rule that motions for a new trial

should be granted cautiously and sparingly and only in the further-ance of substantial justice, we cannot say that the trial court abused its discretion in denying the motion. It appears that the court took the view that the newly discovered evidence, as set forth in the affidavits, was cumulative. From an examination of the affidavits and the entire record we cannot say that there was an abuse of judicial discretion in denying the motion. 14 Dunnell, Dig. (3 ed.) §§ 7123, 7125.

Affirmed.