## CAPITAL WAREHOUSE COMPANY, INC. v. McGILL-WARNER-FARNHAM COMPANY.

149 N. W. (2d) 31.

February 24, 1967—No. 40,056.

*Jerome B. Simon, Joseph A. Maun,* and *Maun, Hazel, Green, Hayes, Simon & Aretz,* for appellant.

*Eugene M. Warlich* and *Doherty, Rumble & Butler,* for respondent.

MURPHY, JUSTICE.

This is an appeal from a judgment awarding Capital Warehouse Company, Inc., the sum of $8,013.60, with interest and costs, for warehouse

labor and services furnished appellant, McGill-Warner-Farnham Company. Appellant contends that the findings of the trial court to the effect that it is indebted to respondent on the basis of an oral or express contract is without support in the record.

Capital Warehouse Company, Inc., hereinafter referred to as "Capital," is engaged in the general warehousing business. McGill-Warner-Farnham Company, hereinafter referred to as "Farnham," is a corporation engaged in the office supply and equipment business. The warehouse building which was utilized in this transaction is referred to as "Building 24." It is one of 15 warehouse buildings owned by 8 members of the McNeely and Frenzel families, some of whom will be referred to specifically in the discussion to follow. It appears that Building 24 is a large structure having a total space area of 260,000 square feet. At the time of the transaction with which we are here concerned, the building was leased to Capital by its owners. The owners are designated in the record as Undivided Real Estate and will be referred to hereinafter as "URE." The owners act through two members of the McNeely-Frenzel families. They are H. G. McNeely and Paul Frenzel, who have powers of attorney from the tenants in common. The controlling stockholders of Capital are also members of the McNeely-Frenzel families. Its president is Paul Frenzel and its chairman of the board, H. G. McNeely. Capital's vice president and principal executive officer is John Seibel. The president and major stockholder of Farnham, Donald G. McNeely, is one of the cotenant-owners of Building 24 and is the son of H. G. McNeely and a nephew of Paul Frenzel. Don McNeely has no interest in Capital aside from the fact that as a cotenant he shares in whatever income is derived from rentals paid by Capital to URE on Building 24. This dispute grows out of a disagreement between members of the Frenzel-McNeely families who have a related and overlapping interest in the companies and properties involved in this transaction.

It would appear that from January through December 1962 certain property of Farnham consisting of commercial furniture was stored or kept in Building 24, leased by Capital. From the record the court could find that the transaction developed in the following way. Sometime in November or December 1961, Don McNeely informed Mr. Seibel,

Capital's vice president and custodian of Building 24, that Farnham needed additional warehouse space and would like to store furniture in Building 24. He told Seibel "that the furniture operation would be moving in and that to expect it because of his responsibility for security and safekeeping" of the building. Accordingly, stocks of Farnham's office furniture were received and stored in Building 24. Seibel testified that they used warehouse receipts on the first shipment but that "was found to be a little clumsy because of Farnham's record keeping, and we were furnished a copy of each purchase order so that when we received this, we could return one copy of this purchase order to Farnham's so they could properly identify each shipment." During the period in question shipments of furniture were received for Farnham, stored on the premises, and shipped out to Farnham's customers. Seibel testified, "I don't recall how the special orders were handled, but all the warehouse stock was delivered to Farnham's uncrating crew by our warehouse man, and Farnham's representative signed for this as it was delivered to him or, at least, by the end of the day." These records were not available at the trial. Seibel said, "I think part of these records were sent back over to Farnham's. We found that some of the records were helpful in identifying some of these shipments, so we sent most of the records back to Farnham's, and I think the rest were destroyed."

At the time the transaction was initiated between Seibel and Don McNeely, it doesn't appear that the terms of the proposed undertaking were precisely stated. Sometime in May 1962 Seibel had discussions with McNeely with reference to "reasonable arrangements" for payment of the services by Farnham. McNeely told Seibel that he would arrange to have Farnham's general manager talk to him with reference to the arrangements. Within a couple of days Farnham's manager, Gordon Heusinkveld, called at Capital, advising Seibel that he had been sent by Farnham to arrange for the rents, and it was agreed that Farnham would pay $3.75 an hour for labor charges furnished by Capital and space rental on the basis of 6 cents per square foot per month. Seibel testified that Heusinkveld agreed to these terms but suggested that Farnham be billed for 2-month periods. In his deposition, which was placed in evidence, Heusinkveld testified that he and Seibel had discussed the charges for

both labor and space and that he agreed on the rates to be charged. With reference to his conference with Seibel, he testified, "Situations like that were always handled in this manner: Mr. McNeely would call me on the phone and say you will go to St. Paul, you will meet a Mr. Seibel and he will tell you that the charges for such and such are so much per hour, you agree to it. It's a good deal. So I would agree to it. We didn't set the rates. I just agreed to something that was already set up by Mr. McNeely."

It appears from the record that in June 1962 Farnham paid Capital for labor and space in the amount of $2,081.25. Bills were submitted each month by Capital to Farnham but no further payments were made until August 26, 1963, at which date Farnham paid $3,595.36, which, together with the earlier payment, represented the total amount of Capital's stated charges for labor at $3.75 an hour. The balance of the claim, which is contested, amounts to $8,013.60 and represents unpaid warehouse service. In relation to this item, the Farnham ledger account for Capital indicates that there was paid to Capital on December 31, 1964, the sum of $8,013.60. This payment was never made. The evidence indicated that, on December 17, 1964, there was prepared by Farnham a check in the sum of $8,013.60 payable to H. G. McNeely, attorney in fact for URE. This was issued pursuant to Don McNeely's written instructions. He testified that it was to be used in an effort to compromise the claim. In sending his instructions to prepare the check, Mr. McNeely noted "Balance due Capital Warehouse Co. $8,013.60."

As opposed to Capital's claim that there was in fact an agreement by Farnham to pay for storage space as well as labor, we have the testimony of Farnham's president that the office furniture was placed in Building 24 under an "interim" or tentative agreement. He testified that there was a great deal of empty space in Building 24 and that, as one of the persons responsible for its successful operation, he was interested in making some effort to have the space utilized. Capital used only a small part of it, and the rent derived from the building was based on the amount of space used. At that time Minnesota Mining & Manufacturing Company had leased direct from URE 60,000 square feet which it used for warehouse purposes. Apparently there was in the back of Don

McNeely's mind the notion that Farnham's furniture might be kept on the premises under some kind of direct arrangement with his cotenants without obligation to Capital. He testified at one point that because of the distance of Building 24 from the Farnham establishment its use for storage space would be disadvantageous and uneconomical. This statement, however, is not consistent with other testimony. The record indicates that the fact Minnesota Mining was using part of the floor space had a bearing on Farnham's decision to move its stock there. Mr. McNeely testified, "I discovered * * * that * * * Farnham was supplying Minnesota Mining with some new desks, and I believe this time is coincident with Minnesota Mining's new building on Highway 12, and it seemed logical to put these new desks adjacent to the Minnesota Mining warehouse distribution center, waiting their move into the new Minnesota Mining building, * * * as they do continuously refurbish their offices, and I distinctly recall these desks were going to Minnesota Mining, and that's what triggered the first move of Farnham into the Building 24."

Mr. McNeely's testimony indicates that he intended to discuss the terms of Farnham's use of the property with his father, but that discussion apparently never came about because "I was not sure at that time how this operation would develop, whether Minnesota Mining would take these out directly or how long they would be in, Minnesota Mining plans to occupy the whole of this area wasn't known, and at this particular moment it was impossible to get into that, didn't know how much space was involved." When his attention was called to the fact that Farnham had actually issued a check in full payment of the balance of the storage charges, he suggested that the check was to be used by him as a means to compromise Capital's claim against Farnham. We assume that the trial court inferred from his testimony that he proposed to take the $8,013.60 check to his father, and if he failed in a compromise or negotiations to reduce the amount of the claim, the check would be delivered. It appears from the testimony of Mr. McNeely that throughout the negotiations relating to this transaction he intended Farnham to utilize the services of Capital with reservations and unexpressed conditions. The following is his testimony on that point:

"Q. You concede, Mr. McNeely, that Farnham's is obligated to Undivided Real Estate for the amount of that check?

"A. Well, I'm not certain about that. After this court case and hearing on it, I don't think by itself—it would seem to me at least, that I, to arrive at an answer, I would need the benefit of some legal counsel.

"Q. So at this time you are not prepared to concede that Farnham's is indebted to URE in that amount?

"A. No."

On the question of whether Farnham was to pay rent or have the space rent free, he was asked by his counsel:

"Q. * * * Will you tell the Court what there was in your mind about the payment of rent by Farnham to clear up this what appears to be two different statements on that subject?

"A. It was extremely difficult to establish the basis on which Farnham was going to occupy the space in 24. First, we did not know how much space, and we did not know for how long, and all the other parts, and in my own mind I decided the thing to do was to wait until this worked out, until we had some compilation of figures as to how much it would cost Farnham and to take it to my father and to arrive at some conclusion on this matter, and to go on from there."

There are certain facts which are not disputed. Capital paid to URE the rent on the space used to store Farnham furniture. It is not contended that the rates charged by Capital are unfair or unreasonable or that they are in excess of Capital's tariff filed with the Railroad and Warehouse Commission. It is also established by the record that at no time did Farnham secure permission to use space in Building 24 by those having the power to act for the cotenants who owned that building.

We direct our attention to appellant's claim that the findings are not supported by the evidence. We have repeatedly held that in reviewing the evidence the findings of the trial court are entitled to the same weight as a jury verdict and will not be disturbed on appeal unless they are manifestly contrary to the evidence and without reasonable evidentiary support. Bosch v. Meeker Co-op. Light & Power Assn. 253 Minn. 77,

91 N. W. (2d) 148; Leuba v. Bailey, 251 Minn. 193, 88 N. W. (2d) 73; 1 Dunnell, Dig. (3 ed.) § 411.

■ The record here presented a fact question as to whether or not a binding contract was entered into between the parties. See, 4 Dunnell, Dig. (3 ed.) § 1730b. We think the evidence fairly establishes a binding agreement requiring Farnham to pay the amount found by the trial court. It is true that the testimony of the parties, as it relates to their oral undertakings, is discursive and that the constituent elements of a valid oral agreement are not nicely etched by the words they used. This circumstance, however, will not prevent a court from finding a valid contract where the acts and conduct of the parties manifested their true intent. In the formation of a contract words alone are not the only medium of expression. The court could consider the surrounding facts and circumstances in the context of the entire transaction, including the purpose, subject matter, and nature of it. There can be no distinction in the effect of a promise, whether it be expressed in writing, orally, in acts, or partly in one of these ways and partly in others. It is the objective thing, the manifestation of mutual assent, which is essential to the making of a contract. McArdle v. Williams, 193 Minn. 433, 258 N. W. 818; Roberge v. Cambridge Co-op. Creamery Co. 248 Minn. 184, 189, 79 N. W. (2d) 142, 146; Cederstrand v. Lutheran Brotherhood, 263 Minn. 520, 532, 117 N. W. (2d) 213, 221; Cut Price Super Markets v. Kingpin Foods, Inc. 256 Minn. 339, 354, 98 N. W. (2d) 257, 268; Markmann v. H. A. Bruntjen Co. 249 Minn. 281, 287, 81 N.W. (2d) 858, 862.

Appellant stresses that the court's finding that there was an "oral contract" is not supported by the record. It does not seem to us to be of importance whether the contract is referred to as an oral contract, an express contract, or a contract implied in fact. As was pointed out in Benedict v. Pfunder, 183 Minn. 396, 400, 237 N. W. 2, 4, the difference between a contract expressed orally and one implied in fact involves no difference in legal effect. We there said:

" 'Words are not the only medium of expression. Conduct may often convey as clearly as words a promise or an assent to a proposed promise, and where no particular requirement of form is made by the law a condition of the validity or enforceability of a contract, there is no distinction

in the effect of a promise whether it is expressed (1) in writing, (2) orally, (3) in acts, or (4) partly in one of these ways and partly in others.' Restatement, Contracts, American Law Institute, § 21."

We think the record, as it relates to what the parties said and did in connection with this transaction, sustains the finding of the trial court. We should assume that the parties here, at least at the outset, were acting fairly and in good faith with Farnham requesting a service of Capital and Capital expecting compensation for it. Farnham understood that Capital was the lessee and the custodian of the warehouse and that, while the rental paid by Capital was limited to the area which it actually occupied in its business operations, Capital nevertheless had responsibility for security measures and fire protection essential to the maintenance of the property. Capital also maintained a staff on the premises which Farnham sought to use in the handling of its merchandise and the allocation of space to be used for the storage of it. The whole transaction presents the picture of Farnham receiving a service which it could not expect to get for nothing. The inference, suggested by the testimony of Farnham's president, that URE was to receive the compensation for this service or that there might somehow be a forgiveness of it would not seem to be a reasonable interpretation of what the parties intended. Certainly, there is no evidence of any substance that Farnham was to have the gratuitous service of either Capital or URE. The fact of this lawsuit refutes any such contention. If the officers of Capital or the agents in fact of URE so understood the transaction, they would not be in court attempting to collect this claim. The whole transaction indicates that both Capital and URE, through their officers and managing directors, comprehended that Farnham should be treated the same as any other customer who used the property for storage purposes.

Appellant suggests that the transaction was in the nature of an illegal lease rather than a bailment. This contention may be disposed of with brief comment. It is not suggested that Capital conducted its business in violation of Minn. St. c. 231, which subjects that business to the supervision of the Railroad and Warehouse Commission, nor in violation of its duties imposed under c. 227, relating to the issuance of warehouse receipts. We fail to see the relevance of any legal distinction which might

excuse or exempt appellant from payment on this basis. If this case involved loss or damage to Farnham's property, that distinction might have some validity. The entire record here, however, compels the conclusion that Capital is in fact a warehouseman who receives and stores goods as a business for compensation and that it treated the business of Farnham in the same manner as it would treat the business given to it by the general public.

Affirmed.

OTIS, JUSTICE (dissenting).

I cannot agree that the evidence supports the court's finding of an oral lease. In my opinion whatever obligation for the use of storage space defendant owed anyone arose out of his relationship as a tenant in common.

I would therefore reverse.

SHERAN, JUSTICE (dissenting).

I agree with the views of Mr. Justice Otis.

MR. JUSTICE PETERSON, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.