*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0403**

Victor Legatt, et al.,
Appellants,

vs.

Dennis Legatt, et al.,
Respondents

**Filed November 30, 2015
Affirmed in part and reversed in part
Worke, Judge**

Stearns County District Court
File No. 73-CV-12-3629

James L. Noske, Noske Law Firm, St. Cloud, Minnesota (for appellants)

Benjamin B. Bohnsack, Matthew P. Lindeman, Rinke Noonan, St. Cloud, Minnesota (for respondents)

Considered and decided by Hooten, Presiding Judge; Halbrooks, Judge; and Worke, Judge.

**U N P U B L I S H E D   O P I N I O N**

**WORKE**, Judge

In this lease, easement, and surface-water-drainage dispute between neighboring farmers, appellants argue that the district court erred by (1) finding that respondents' replacement of a drainage swale with tiling did not violate the reasonable-use doctrine,

(2) determining that appellants could not bring a breach-of-contract claim after respondents leased land to a third party that was previously leased to appellants, (3) concluding that respondents had a permanent easement across appellants' land for their irrigation pivot, and (4) finding that respondents were entitled to damages after appellants violated respondents' easement rights. Because the district court's determinations that (1) respondents did not violate the reasonable-use doctrine, (2) appellants could not bring a breach-of-contract claim after first violating the lease, and (3) respondents were entitled to damages were not clearly erroneous, we affirm in part. But because the district court clearly erred in finding that the long-term land-use contract created a permanent easement, we reverse in part.

## FACTS

Appellants Victor and Mary Legatt (Victor) and respondents Dennis and Lois Legatt (Dennis) own adjoining farmland in Stearns County. For over a decade, the parties have jointly farmed portions of their adjoining acres and utilized numerous land-use and related agreements. In April 2012, Victor filed a complaint alleging numerous claims pertaining to the parties' business relationship, and Dennis counterclaimed. In February 2014, the district court heard Victor's case-in-chief and subsequently dismissed the matter pursuant to Minn. R. Civ. P. 41.02(b). The district court denied Victor's motion for amended findings or, alternatively, a new trial. In December 2014, the district court heard Dennis's counterclaims. Dennis was awarded monetary damages for lost crop production and related costs and was granted a permanent easement over Victor's land. The facts relevant to the appealed issues are as follows.

2

*Drainage*

A meadow and swamp are located on the northeast portion of Victor's land, where the elevation is lowest. The meadow and swamp are both wetlands and cannot be drained for crop production. Prior to this dispute, a natural grassway transported surface water from the street, across Dennis's land, and to Victor's meadow. In 2006, Victor installed an underground perforated tile system alongside the grassway. The tile that ran under the meadow and into the swamp reduced surface water and improved crop production. In 2011, Dennis filled in the grassway and replaced it with tiling; it is undisputed that this increased Dennis's farming efficiency, increased farmable land, and reduced erosion. Dennis also constructed a berm on his land. The tiling did not alter the natural flow and direction of the water, and it carried water to Victor's meadow just as the grassland did. Victor claimed that Dennis's actions caused water to back up on his field, flooded some of his crops, and made areas of his land too wet to cross with machinery. But Victor maintained that these water issues only occurred after an anomalously large amount of rain. The district court found that Dennis's actions did not alter the natural flow and direction of water and that Victor presented no credible evidence that the flooding was caused by the replacement of the grassway rather than natural variations in rainfall.

*South Acres Crop Share*

Dennis and Victor had a written contract allowing Victor to farm 73 of Dennis's acres (south acres) from 2004 through 2013. The contract required Victor to pay Dennis 4,760 bushels of dry corn for the use of the land and the use of Dennis's irrigation pivot.

Beginning in 2009, Victor withheld corn bushels from Dennis's annual corn payment as follows:

(1) 180 bushels in 2009;
(2) 951 bushels in 2010; and
(3) 4,760 bushels, the entire rent, in 2011.

Victor admits that he had sufficient corn to pay Dennis and that he withheld payment for leverage over the parties' other disputes. Dennis requested his share of the corn crop and when Victor refused to release it, Dennis notified Victor that continued withholding would result in lease termination.

In April 2012, before Victor began preparing the south acres for planting, he noticed a neighbor picking rock on Dennis's land. Victor showed the neighbor his land-use agreement, but the neighbor continued picking rock and eventually planted crops on the land. Victor then delivered the withheld corn to Dennis around June 2012.

*Irrigation Pivots*

The parties had a written contract that leased Victor an irrigation pivot (Pivot A) from Dennis in exchange for corn from 2005 to 2013. The pivot turned 360 degrees and covered four 40-acre sections (two northerly and two southerly). Thus, Pivot A crossed and irrigated both parties' lands. Dennis paid for the installation of Pivot A, and Victor provided the power source and well. Victor then refused to allow Pivot A to cross his property, prohibiting parts of Dennis's land from being irrigated.

Since 1994, the parties had agreements permitting Victor to farm portions of Dennis's north acres in exchange for a portion of the crops produced. In 2008, Dennis purchased and installed Pivot B, for a cost of $129,000, and Victor purchased and

4

installed Pivot C, for a cost of $40,000. Both pivots crossed the opposing party's land. The parties utilized an oral agreement for the 2008 pivot use and entered into a written agreement in July 2008 at the request of the Minnesota DNR.

Dennis claims that in 2009, Victor informed him that Pivot B could no longer cross Victor's property and physically blocked the pivot. Victor contends that Dennis voluntarily moved the pivot after deciding not to cross the land; Dennis contends that Victor would only allow Dennis to cross the land if Dennis paid for reinstallation of the pivot. Victor testified that in 2009 he changed his mind and decided to allow the pivot to cross his property, but the district court found this testimony to not be credible and concluded that Victor would only have allowed Dennis to cross the land if Dennis rented his north acres to Victor. Because Pivot B's blockage prevented Dennis from irrigating some of his crops in 2009, the district court awarded Dennis $2,543 for decreased crop production and $29,914 for the cost of reconfiguring the pivot, finding that this was the least expensive means to remedy the blockage. Dennis was also granted a permanent easement to cross Victor's land with his irrigation pivot.

The district court also concluded that there was an implied-in-fact contract term which indicated that the parties intended the Pivot A agreement to extend beyond 2013. The district court estopped Victor from preventing Pivot A from crossing his property and granted Dennis an easement to continue using Pivot A indefinitely.

This appeal follows.

### D E C I S I O N

The district court first dismissed Victor's claims pursuant to Minn. R. Civ. P. 41.02(b) which states that:

> After the plaintiff has completed the presentation of evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law, the plaintiff has shown no right to relief. In an action tried by the court without a jury, the court as trier of the fact may then determine the facts and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.

We will not set aside the district court's findings under a rule 41.02(b) involuntary dismissal unless they are clearly erroneous.

***Reasonable-Use Doctrine***

Victor argues that Dennis violated the reasonable-use doctrine when he filled in the swale and grassway on his property and thus altered the natural watercourse. We review a district court's findings for clear error. *Highview N. Apartments v. Cty. Of Ramsey*, 323 N.W.2d 65, 67 (Minn. 1982). A finding is clearly erroneous if it "is palpably and manifestly against the weight of the evidence." *Kral v. Boesch*, 557 N.W.2d 597, 598 (Minn. App. 1996). Minnesota has adopted the reasonable-use doctrine which "permits a property owner to drain surface waters onto another's land if the elements of the reasonable-use doctrine are met." *Goerke Family P'ship v. Lac qui Parle-Yellow Bank Watershed Dist.*, 857 N.W.2d 50, 54 (Minn. App. 2014). Under the reasonable-use doctrine, a landowner may divert surface water to another's land, even if some of the water would not have naturally gone to the other's land, if:

6

> (a) there is a reasonable necessity for such drainage;
> (b) reasonable care be taken to avoid unnecessary injury to the land receiving the burden;
> (c) the utility or benefit accruing to the land drained reasonably outweighs the gravity of the harm resulting to the land receiving the burden;
> (d) where practicable, it is accomplished by reasonably improving and aiding the normal and natural system of drainage according to its reasonable carrying capacity, or if, in the absence of a practicable natural drain, a reasonable and feasible artificial drainage system is adopted.

*Kral*, 557 N.W.2d at 599 (quotation omitted). When evaluating reasonableness, the court should consider (1) the extent of the harm, (2) the foreseeability of the harm, and (3) the motive for the action. *Id.* "The reasonable use rule cannot be reduced to a cut-and-dried formula. What is reasonable use is a fact question to be resolved according to the peculiar facts of each case." *Duevel v. Jennissen*, 352 N.W.2d 93, 96 (Minn. App. 1984).

Victor does not directly challenge the district court's finding that filling in the swale and grassway was reasonably necessary because it "improved farming efficiency and production" and "reduced erosion." And this court has previously upheld a district court's determination that drainage that improves crop output is reasonably necessary, *Goerke*, 857 N.W.2d at 56, and that installing a drainage system that significantly increased tillable land was permissible under the reasonable-use doctrine, *Duevel*, 352 N.W.2d at 96-97. Therefore, the district court did not clearly err in finding that filling in the grassway was reasonably necessary.

Victor also argues that because Dennis used perforated tiling, which is meant to draw down saturated soils rather than transport flowing or surface water, the district court erred in finding that Dennis took reasonable care to avoid unnecessary injury. Victor

7

argues that Dennis was forced to build a berm to impede water flow across his land because the tiling was inadequate. But the record lacks detail as to why the berm was constructed and how it affects water flow, including whether it directs water onto Victor's land. We give "great deference to a [district] court's findings of fact because it has the advantage of hearing the testimony, assessing relative credibility of witnesses and acquiring a thorough understanding of the circumstances unique to the matter before it." *Hasnudeen v. Onan Corp.*, 552 N.W.2d 555, 557 (Minn. 1996). The district court found that "[n]o credible evidence was presented establishing that the 2011 tiling transports additional water to Victor's meadow," and other than photographs showing the fields after an "exceptionally rainy period in May, there is no evidence that Victor's land is flooded." The district court further found that Victor's testimony about increased water flow to his fields was not credible and noted that he did not present any expert testimony about the flow, rate, or volume of water being transported. Without this testimony, there is no concrete evidence that Dennis's tiling system was inadequate. Therefore, the district court did not clearly err in finding that the tiling system constituted reasonable care to avoid injury.

Because filling in the grassway and swale indisputably improved Dennis's production and the district court found that there was no harm to Victor, the benefit to Dennis outweighs the gravity of harm to Victor. Although Victor adamantly disputes the district court's finding that there was no harm to him, he did not provide any evidence to rebut the district court's findings that the standing water was due to an anomalous rain. Without evidence that the area regularly receives rainstorms akin to the one that preceded

8

the flooding, we cannot conclude that the district court's finding that the heavy rain caused the damage was clearly erroneous.

Victor argues the fourth factor, that where practicable, drainage is accomplished by reasonably improving and aiding the normal and natural system of drainage or, if no natural drain, a reasonable and feasible artificial drainage system, "overshadows" the other factors and requires a ruling in his favor. Victor relies upon the concurring opinion in *Sheehan v. Flynn* for his assertion that Dennis was required to use the natural grassway and swale for drainage. 59 Minn. 436, 451, 61 N.W. 462, 466-67 (1894) (Mitchell, J., concurring). The *Sheehan* concurrence states that "[o]f course, a man cannot change or divert, to the prejudice of his neighbor, the natural outlet or drainage of surface water." *Id.* But Victor overstates the significance of this phrase, misinterpreting it to mean that a person may never alter a natural channel; prior to the cited phrase, the concurrence states that "[t]his does not mean, however, that the owner of land is not permitted to improve it, but must abandon it to perpetual sterility, simply because its drainage would produce some change in the manner of discharging surface water, or in the amount discharged." *Id.* at 450, 61 N.W.2d at 466. The supreme court ultimately held that the drainage was a permissible improvement provided that the defendant did "what is reasonable under all the circumstances." *Sheehan v. Flynn*, 59 Minn. 436, 442-43, 449, 61 N.W.2d 462, 463, 466 (1894). There is no bright-line requirement that Dennis could not alter the manner of drainage, particularly where the district court found that the new tiling system did not alter drainage.

Victor also cites several cases where landowners were required to remove water blockages. But these cases are factually distinguishable and do not negate the application of the reasonable-use doctrine. In *Town of King v. Brekke*, the defendant built a dike that caused the flooding of a highway bridge that crossed a natural water-carrying depression. 151 Minn. 474, 475, 187 N.W. 515, 515 (1922). The supreme court held that the defendant was prohibited from obstructing the water, stating that

> [t]he owner of lower land has no more right, in dealing with surface water for the purpose of drainage, to cast it back upon his upper neighbor in times of freshets by means of a dike, than an upper owner has to change or divert it to the prejudice of his lower neighbor.

*Id.* at 476-77, 187 N.W. at 516. The supreme court noted that the dike did not aid drainage of the defendant's land and that he had the "duty to continue the water in a natural channel" because his method of disposing the surface water was unreasonable "when considered in connection with the benefits and damages resulting therefrom." *Id.*

Although *Brekke* held that the defendant—who unlike Dennis owned the lower-elevation land—had a duty to continue the water in the accessible natural channel, it considered this duty in terms of reasonableness. *Id.* This case does not stand for the proposition that natural channels must be used in all circumstances.

In *Will v. Boler*, adjacent landowners permanently widened a natural swale, increasing drainage of surface water. 212 Minn. 525, 526-27, 4 N.W.2d 345, 346-47 (1942). Thirty-five years later, the defendants, owners of the lower land, filled in portions of the ditch, diverting water onto and harming the plaintiff's land. *Id.* The supreme court cited *Sheehan's* holding as follows:

10

> The old common-law rule that surface water is a common enemy, which each owner may get rid of as best he can, is in force in this state, except that it is modified by the rule that he must so use his own as not unnecessarily or unreasonably to injure his neighbor. Under this rule, it is the duty of an owner draining his own land to deposit the surface water in some natural drain, if one is reasonably accessible; and he is entitled to deposit the same in such natural drain, though it is thereby conveyed upon the land of his neighbor, if it does not thereby unreasonably injure him.

*Id.* at 529, 4 N.W.2d at 348 (quoting *Sheehan*, 59 Minn. at 436, 61 N.W. at 462). The supreme court concluded that the defendant was estopped from closing the ditch because the parties' previous expansion of drainage was a joint project that benefited both parties and the modification violated the reasonable-use doctrine. *Id.* at 530, 4 N.W.2d at 348.

Here, like the parties in *Will*, Dennis previously expanded the natural swale to increase its drainage. But the expansion was not a joint project, and we cannot conclude that Dennis had a duty to maintain the swale in its previous condition when there was no damage.

Alternatively, even if there was damage to Victor's land from the change in drainage, we conclude, under all the reasonable-use doctrine factors, that Dennis's actions were permissible. The balance of the factors weighs in favor of Dennis, and there is no strict requirement prohibiting alteration of the swale.

***South Acres Breach of Contract***

Victor argues that the district court clearly erred by concluding that he could not bring a breach-of-contract claim against Dennis because Victor first breached the land-use agreement by withholding rental payments. The district court concluded that Victor's

withholding of corn constituted anticipatory repudiation, and that this breach excused Dennis's future performance. Victor additionally contends that Dennis was required to bring an eviction action and that the district court erred by determining that an eviction action would have been an inappropriate action because Victor was not actually in possession of the land.

Anticipatory breach occurs when there is "an unconditional repudiation of a contract, either by words or acts, which is communicated to the other party prior to the time fixed by the contract for his performance." *In re Haugen*, 278 N.W.2d 75, 79 n.6 (Minn. 1979). "An anticipatory breach by repudiation occurs where a vendor cannot possibly perform and where by its conduct it demonstrates an unequivocal intent not to perform." *State ex rel. Friends of the Riverfront v. City of Minneapolis*, 751 N.W.2d 586, 593 (Minn. App. 2008) (quotation omitted) (holding that where it was still possible for a party to perform a contract, the other party could not establish anticipatory breach), *review denied* (Minn. Sept. 23, 2008). The adversarial party may treat the renouncement as a breach of contract and bring an action for damages. *Space Ctr., Inc. v. 451 Corp.*, 298 N.W.2d 443, 450 (Minn. 1980).

It is undisputed that Victor had the corn available as payment for rent but chose not to release it because it gave him leverage over Dennis on other issues. Victor repeatedly declared that his intention was to withhold the 2011 corn payment when it came due. Victor also left a voicemail for Dennis's attorney in November 2011. In it he stated that "I have no problem giving him the corn, but I am not releasing a kernel of corn until we get the 2008 issues that we had on hand resolved." We agree with the district

12

court's finding that this was an unqualified renunciation of the contract. The record thus supports the finding of anticipatory repudiation. The conclusion of anticipatory repudiation supports Dennis's nonperformance of the contract, warranting his rescission of the contract. *See Sheet Metal Workers Local No. 76 Credit Union v. Hufnagle*, 295 N.W.2d 259, 262 (Minn. 1980) (stating that the remedy for anticipatory repudiation is "to treat the entire contract as broken"). The district court did not err in determining that Dennis had no further obligation to continue renting his portion of the south acres to Victor.

Victor next asserts that he can maintain his breach-of-contract action against Dennis even though Victor first breached the contract by withholding payment. The district court concluded that because Victor materially breached the contract, Dennis could treat it as a total breach and was excused from performing under the contract. A material breach is "a breach of contract that is significant enough to permit the aggrieved party to elect to treat the breach as total (rather than partial), thus excusing that party from further performance and affording it the right to sue for damages." *BOB Acres, LLC v. Schumacher Farms, LLC*, 797 N.W.2d 723, 728 (Minn. App. 2011) (quoting *Black's Law Dictionary* 214 (9th ed. 2009). A material breach is one that "goes to the root or essence of the contract." Whether a breach is material is a question of fact. *Cloverdale Foods of Minn., Inc. v. Pioneer Snacks*, 580 N.W.2d 46, 49 (Minn. App. 1998). Although in the first two years of breach, Victor only withheld a small portion of the bushels of corn, the third year he withheld the entire rent payment for the land and

13

pivot use. Here, payment of corn in exchange for land use essentially encompassed the parties' agreement. Therefore, nonpayment constituted a material breach.

Where there is a material breach, the nonbreaching party may rescind the contract if the injury is irreparable, or where damages would be inadequate, difficult, or impossible to determine. *Johnny's, Inc. v. Njaka*, 450 N.W.2d 166, 168 (Minn. App. 1990). Here, Dennis rescinded the contract after a material breach by renting the land to another farmer. Even though forfeitures are disfavored, *Cloverdale*, 580 N.W.2d at 49, Victor does not have a breach-of-contract claim against Dennis because Dennis was justified in rescinding the contract.

Victor alternatively asserts that Dennis's proper action for nonpayment of rent was an eviction action because the parties had a landlord-tenant relationship, which gave Victor a "right of redemption." Even if the parties had a landlord-tenant relationship, "[e]viction actions are summary proceedings that are intended to adjudicate only the limited question of present possessory rights to the property." *Deutsche Bank Nat'l Trust Co. v. Hanson*, 841 N.W.2d 161, 164 (Minn. App. 2014). Because Victor did not actually possess the land at the time Dennis rented it to a third party, an eviction action would be inappropriate.

*Damages*

Victor argues that the district court erred in awarding damages to Dennis for Pivot B's blockage because its findings of fact are erroneous. Victor asserts that the district court erred in finding that he "physically blocked Pivot B with a field stop" and in finding Victor's testimony that he changed his mind about allowing access not credible. We

14

defer to a district court's findings on credibility. *Sefkow v. Sefkow*, 427 N.W.2d 203, 210 (Minn. 1988).

Victor claims that the district court erred in finding that he blocked the pivot's access because the parties had a series of discussions, and he agreed to let Dennis cross the field if Dennis filled in the wheel tracks with rock. But Victor's assertion that he decided to allow access is not supported by the record: although Dennis admitted that Victor said Dennis could cross the land, he also said that permission was "tied in" with Victor receiving the contract he wanted, and Dennis did not recall actually agreeing to fill in the wheel tracks. Dennis also sent Victor a letter in July 2009 in which Dennis states that he "decided to run the pivot up to [Victor's] property line" because they were unable to reach an agreement.

Victor also claims that he never installed a field stop on the tire track. But the court implicitly found Dennis's testimony, that Victor told him many times he could not cross the field, threatened to put up a property-line fence, and created a physical blockage, credible. While there is no testimony that Victor put an actual "field stop" on the track, there is testimony that the track was physically blocked. Victor admits that a dismantled pivot was placed where Pivot B would cross, but he argues that the finding of blockage is erroneous because the pivot could have easily been moved. Even if that assertion is correct, there is no legal basis to require Dennis to move Victor's equipment from Victor's land without permission. On this record, we cannot find that the district court's findings of facts regarding damages were clearly erroneous.

*Easement*

Victor asserts that the district court erred in granting Dennis a permanent easement allowing Pivot A to cross Victor's land. First, Victor argues that the easement could not be "implied in fact" because of the statute of frauds. "The statute of frauds applies to grants of easements." *Berg v. Carlstrom*, 347 N.W.2d 809, 812 (Minn. 1984). "[T]he difference between a contract expressed orally and one implied in fact involves no difference in legal effect." *Capital Warehouse Co. v. McGill-Warner-Farnham Co.*, 276 Minn. 108, 114, 149 N.W.2d 31, 36 (1967). While an easement may be taken out of the statute of frauds through part performance or through the doctrines of equitable or promissory estoppel, there is no such similar requirement for implied-in-fact contracts. *See Berg*, 347 N.W.2d at 812 (applying the doctrine of equitable estoppel to an agreement normally limited by the statute of frauds). Therefore, the district court erred by considering the easement under an implied-in-fact theory. Additionally, there is no evidence that both parties intended the easement to continue; Dennis only testified that he would not have purchased Pivot A without intending a longer usage period. There is no evidence as to Victor's intent.

Victor next challenges the district court's conclusion that the "Pivot Agreement did not specifically state that the easement would continue past 2013 because it was a fundamental and implied term of the agreement." While this relates to the continued easement being an implied-in-fact-term, "easement by implication" is a term of art. *See Black's Law Dictionary* 458 (5th ed. 1979) (defining "implied easement" as "[o]ne which the law imposes by inferring the parties to a transaction intended that result, although

16

they did not express it." Three essential factors are required for an easement by implication: "(1) a separation of title; (2) the use which gives rise to the easement shall have been so long continued and apparent as to show that it was intended to be permanent; and (3) that the easement is necessary to the beneficial enjoyment of the land granted." *Clark v. Galaxy Apartments*, 427 N.W.2d 723, 726 (Minn. App. 1988). "The existence of an implied easement is determined at the time of severance." *Lake George Park, L.L.C. v. IBM Mid-Am. Emps. Fed. Credit Union*, 576 N.W.2d 463, 465 (Minn. App. 1998), *review denied* (Minn. Jun 17, 1998). A subsequent change of conditions does not create an implied easement. *Niehaus v. City of Litchfield*, 529 N.W.2d 410, 412 (Minn. App. 1995). The party attempting to establish the easement bears the burden of proving its necessity at the time of severance. *Id.* Here, the parties owned their respective acres prior to installing Pivot A; therefore, no implied easement existed at the time of severance. Further, the lease specifically defined the period that Pivot A could cross the land; thus, the use is not continued. Finally, although irrigation increases production, it is not necessary to the beneficial enjoyment of the land. We therefore conclude that there is no implied easement.

An easement by estoppel "is created from a voluntary servitude after a person, mistakenly believing the servitude to be permanent, acted in reasonable reliance on the mistaken belief." *Black's Law Dictionary* 586 (9th ed. 2009). The Minnesota Supreme Court has adopted two descriptions of easement by estoppel:

> When a grantor conveys part of his land to a grantee with knowledge of the latter's intended use of the land so conveyed, and the use so intended necessarily involves some

17

> curtailment of the grantor's use of his retained land, an easement arises in favor of the grantee as against the grantor. The grantor is estopped to deny that the grantee acquired the necessary easement. Similarly, when a vendor represents to his purchaser that the land sold will be served by an easement over reserved land of the vendor, the vendor is estopped to deny the existence of such easement although it is unmentioned in the conveyance." . . . . The gist of the doctrine is that if a vendor who has reserved some property to himself represents to the vendee that he will have an easement over the vendor's property as part of the sales transaction, the vendor may be later estopped from denying the easement. The key requirement is that of "representation"; Tiffany refers to the doctrine as "estoppel by representation, by means of conduct of a particular character."

*Highway 7 Embers, Inc. v. Nw. Nat'l Bank*, 256 N.W.2d 271, 277-78 (Minn. 1977) (quotations omitted).  The statute of frauds does not apply to equitable estoppel.  *Poksyla v. Sundholm*, 259 Minn. 125, 129, 106 N.W.2d 202, 205 (1960).

Victor first asserts that there was no conveyance.  But Victor and Dennis entered into an agreement whereby the pivot could cross the land.  This constitutes a conveyance. Although the district court found Dennis's testimony that he would not have purchased the pivot if he believed the use would be limited to 10 years credible, there is no evidence that Victor represented the agreement would last longer than 10 years.

Dennis is attempting to make an easement out of a contract issue.  The lease agreement is not ambiguous and clearly states that the lease, which both parties benefited from, was enforceable for 10 years.  The original agreement was for a set-term *lease*, not an indefinite *easement*.  Nothing indicates that both parties actually considered that the land-use agreement would last longer than 10 years.  In fact, if Dennis truly had an indefinite easement, a 10-year lease would not have been necessary.  Victor's potential

18

benefit from a greater than the expressly agreed upon period also does not require a lease extension. *See Highway 7 Embers*, 256 N.W.2d at 278 ("Embers bargained for and received an express easement over a part of the . . . property. The equities do not balance so heavily in favor of Embers as to require an extension of that express grant.").

On the other hand, Victor provides no reason for preventing the pivot from crossing the land—the pivot provided irrigation to both Dennis's and Victor's lands, and Victor built his own pivot after he determined that Dennis could not cross his land. While the parties may have contemplated something longer, especially given the expense of installing a pivot, this possibility does not provide evidence in the record that Victor made any kind of representation. Therefore, the district court erred by determining that Dennis had an indefinite easement for Pivot A.

**Affirmed in part and reversed in part.**